960 A.2d 360

RAYMOND ARTHUR ABBOTT, A MINOR, BY HIS GUARDIAN AD LITEM, FRANCES ABBOTT; ARLENE FIGUEROA, FRANCES FIGUEROA, HECTOR FIGUEROA, ORLANDO FIGUEROA AND VIVIAN FIGUEROA, MINORS, BY THEIR GUARDIAN AD LITEM, BLANCA FIGUEROA; MICHAEL HADLEY, A MINOR, BY HIS GUARDIAN AD LITEM, LOLA MOORE; HENRY STEVENS, JR., A MINOR, BY HIS GUARDIAN AD LITEM, HENRY STEVENS, SR.; CAROLINE JAMES AND JERMAINE JAMES, MINORS, BY THEIR GUARDIAN AD LITEM, MATTIE JAMES; DORIAN WAITERS AND KHUDAYJA WAITERS, MINORS, BY THEIR GUARDIAN AD LITEM, LYNN WAITERS; CHRISTINA KNOWLES, DANIEL KNOWLES AND GUY KNOWLES, JR., MINORS, BY THEIR GUARDIAN AD LITEM, GUY KNOWLES, SR.; LIANA DIAZ, A MINOR, BY HER GUARDIAN AD LITEM, LUCILA DIAZ; AISHA HARGROVE AND ZAKIA HARGROVE, MINORS, BY THEIR GUARDIAN AD LITEM, PATRICIA WATSON; AND LAMAR STEPHENS AND LESLIE STEPHENS, MINORS, BY THEIR GUARDIAN AD LITEM, EDDIE STEPHENS, PLAINTIFFS–RESPONDENTS AND CROSS–MOVANTS, v. FRED G. BURKE, COMMISSIONER OF EDUCATION; EDWARD G. HOFGESANG, NEW JERSEY DIRECTOR OF BUDGET AND ACCOUNTING; CLIFFORD A. GOLDMAN, NEW JERSEY STATE TREASURER; AND NEW JERSEY STATE BOARD OF EDUCATION, DEFENDANTS–MOVANTS AND CROSS–RESPONDENTS.

Argued September 22, 2008—Decided November 18, 2008.

See also 100 N.J. 269, 495 A.2d 376; 119 N.J. 287, 575 A.2d 359; 136 N.J. 444, 643 A.2d 575; 172 N.J. 294, 798 A.2d 602; 177 N.J. 578, 832 A.2d 891.

———

*Robert J. Gilson,* Director, Division of Law, Assistant Attorney General, argued the cause for movants and cross-respondents (*Anne Milgram,* Attorney General of New Jersey, attorney; *Nancy Kaplen,* Assistant Attorney General and *Michelle Lyn Miller,* Senior Deputy Attorney General, on the briefs).

*David G. Sciarra,* Executive Director, Education Law Center, argued the cause for respondents and cross-movants (*Mr. Sciarra and Gibbons,* attorneys; *Mr. Sciarra, Elizabeth A. Athos, Theresa Luhm, Ellen Boylan, Avidan Y. Cover and Deborah G. Splansky,* on the briefs).

*Emily B. Goldberg* submitted a brief on behalf of amicus curiae Urban Mayors' Association (*Seton Hall University School of Law Center* for Social Justice and *American Civil Liberties Union of New Jersey Foundation,* attorneys; *Ms. Goldberg, Edward L. Barocas and Jeanne M. LoCicero,* on the brief).

*Cecilia M. Zalkind* submitted a brief on behalf of amicus curiae Association for Children of New Jersey.

*Mary A. Ciccone* submitted a brief on behalf of amici curiae Alliance for The Betterment of Citizens with Disabilities, The Brain Injury Association of New Jersey, New Jersey Protection & Advocacy, Inc., New Jersey Special Education Practitioners, Special Education Clinic at Rutgers University School of Law–Newark and Special Education Leadership Council of New Jersey.

*Arnold Robinson* submitted a letter in lieu of brief on behalf of amicus curiae Millville Board of Education (*Robinson, Andujar & Webb,* attorneys).

*Richard A. Friedman* submitted a letter in lieu of brief on behalf of amicus curiae New Jersey Education Association (*Zazzali, Fagella, Nowak, Kleinbaum & Friedman,* attorneys).

*Robert A. De Santo,* submitted certifications in lieu of brief on behalf of amicus curiae Vineland Board of Education (*Gruccio, Pepper, De Santo & Ruth,* attorneys).

*Rafael C. Haciski* submitted a letter brief on behalf of amicus curiae Camden City School District (*WolfBlock,* attorneys).

*Richard E. Shapiro* submitted a brief on behalf of amici curiae Boards of Education of City of Bridgeton, City of Burlington, City of East Orange, City of Elizabeth, Gloucester City, Keansburg Borough, Jersey City Public Schools, City of Passaic, State–Operated School District of Paterson, Pemberton Township, City of Perth Amboy, Town of Phillipsburg and City of Trenton.

*Morris G. Smith* submitted a letter brief on behalf of amicus curiae New Jersey Black Issues Convention.

*Perry L. Lattiboudere,* General Counsel, submitted a letter brief on behalf of amicus curiae State Operated School District of the City of Newark.

*Anna Maria Tejada* submitted a letter in lieu of brief on behalf of amicus curiae Hispanic Directors Association of New Jersey (*Kaufman Dolowich & Voluck,* attorneys).

*Stephen Eisdorfer* submitted a brief on behalf of amicus curiae Dollar$ and Sense (*Hill Wallack,* attorneys).

PER CURIAM.

Since the early 1970s, pupils attending some of New Jersey's poorest school districts have come to the courts of this state to obtain fulfillment of their right to a thorough and efficient education guaranteed by the New Jersey Constitution. *N.J. Const.* art. VIII, § 4. This Court has enforced that constitutional guarantee for students in so-called "special needs" school districts since 1973, first in the *Robinson v. Cahill* litigation,[1] and, later, in this action, commenced in 1981 to challenge the constitutionality of the Public School Education Act of 1975, *L.* 1975, *c.* 212 (Chapter 212).

In our first decision in this matter, this Court referred plaintiffs' challenge to the Commissioner of Education for the development of a record. *Abbott v. Burke,* 100 *N.J.* 269, 495 *A.*2d 376 (1985) (*Abbott I* ). Ultimately, plaintiffs carried their burden to over-

---

[1] *See Robinson v. Cahill,* 62 *N.J.* 473, 303 *A.*2d 273 (1973) (*Robinson I* ) and ensuing decisions culminating in *Robinson v. Cahill,* 70 *N.J.* 464, 360 *A.*2d 400 (1976).

come the presumption of validity that is accorded to legislative enactments, and successfully demonstrated the unconstitutionality of public school funding under Chapter 212 as applied to them. *See Abbott v. Burke*, 119 *N.J.* 287, 575 *A.*2d 359 (1990) (*Abbott II* ). The State was ordered to provide plaintiffs attending special needs districts (later designated as "Abbott districts") with a constitutionally compliant education, *id.* at 374, 575 *A.*2d 359, supported by funding in accordance with standards established to guide the State's achievement of a constitutional system of education, *id.* at 384–86, 575 *A.*2d 359.

The State's efforts to comply with its constitutional obligation have spanned decades. Plaintiffs have had to bring numerous challenges to ensure that the State satisfied its constitutional obligation. They have worked long and hard to obtain a constitutionally sound, mandated educational program that is supported by a consistent level of State funding. And, their success has enabled children in Abbott districts to show measurable educational improvement. That background brings the present application into sharp relief.

In January 2008, the Legislature passed, and the Governor signed into law, a new school funding formula titled the School Funding Reform Act of 2008 (SFRA), *L.* 2007, *c.* 260. Thereafter, the State sought to reopen this matter by filing a motion seeking declarations that the SFRA satisfies the requirements of the thorough and efficient education clause of the New Jersey Constitution and, further, that the Court's prior remedial orders concerning the provision of a thorough and efficient education in the Abbott districts "are no longer necessary." Plaintiffs, through the Education Law Center (ELC), opposed the State's motion. Moreover, plaintiffs filed a cross-motion seeking an order that preserves the "status quo" in this decades-old litigation and that specifically declares that this Court's prior remedial orders remain in force.

On September 22, 2008, the Court heard oral argument on the dual applications. For the reasons hereinafter set forth, we

conclude that this matter cannot be resolved on an undeveloped record. Because the issues before us require more than a summary review, we order that this matter be remanded for further proceedings consistent with this opinion.

## I.

It is well recognized that legislative enactments enjoy a presumption of validity. *See State v. Trump Hotels & Casino Resorts,* 160 *N.J.* 505, 526, 734 *A.*2d 1160 (1999) (noting that presumption of validity attaches to statutory enactments); *Abbott v. Burke,* 149 *N.J.* 145, 174, 693 *A.*2d 417 (1997) (*Abbott IV*) ("We do not minimize the State's contention that, as a legislative enactment [the statute before us] is entitled to a presumption of validity"); *N.J. Sports & Exposition Auth. v. McCrane,* 61 *N.J.* 1, 8, 292 *A.*2d 545 (1972) (recognizing presumption of validity conferred on legislative enactments), *appeal dismissed sub nom, Borough of E. Rutherford v. N.J. Sports & Exposition Auth.,* 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.*2d 215 (1972); *Gangemi v. Berry,* 25 *N.J.* 1, 10, 134 *A.*2d 1 (1957) (same). Ordinarily, a party challenging a legislative enactment bears the burden of overcoming that presumption and proving that the law is unconstitutional. *See Hamilton Amusement Ctr. v. Verniero,* 156 *N.J.* 254, 285, 716 *A.*2d 1137 (1998) (noting that party may overcome presumption of constitutionality by demonstrating, beyond reasonable doubt, statute's repugnancy to Constitution (citing *Harvey v. Bd. of Chosen Freeholders,* 30 *N.J.* 381, 388, 153 *A.*2d 10 (1959))); *see also Jamouneau v. Harner,* 16 *N.J.* 500, 515, 109 *A.*2d 640 (1954) (explaining that when constitutionality of legislation must be addressed, every reasonable intention is accorded to enactment). As Chief Justice Hughes explained, our judicial restraint springs from a

seemly respect for the act of a co-equal branch of government, as well as for the public interest in the effective operations of government—both elements invoking a "broad tolerance" in considering a charge of constitutional evasion or excess. [*N.J. Ass'n on Correction v. Lan,* 80 *N.J.* 199, 218, 403 *A.*2d 437 (1979) (citations omitted).]

■ The SFRA, however, was not enacted in an ordinary context. Plaintiffs, more than once, have carried their burden when challenging prior school funding statutes, resulting in the invalidation of those funding schemes. *See, e.g., Abbott IV, supra,* 149 *N.J.* at 188, 693 *A.*2d 417; *Abbott v. Burke,* 136 *N.J.* 444, 451, 643 *A.*2d 575 (1994) (*Abbott III* ). As a consequence of plaintiffs' successful prior challenges to constitutionally deficient funding schemes, this Court has entered specific remedial orders to ensure that plaintiffs would receive a constitutional level of funding. *See infra,* Section III.A (summarizing history of Court's involvement, fashioning remedies to ensure plaintiffs' receipt of State-supported thorough and efficient education). SFRA is the most recent legislative effort toward the enactment of a constitutional school funding statute. We cannot ignore that SFRA's passage came in the wake of the constraining circumstances of those prior remedial orders directed at the State.

The State comprehends the unique procedural circumstances before us because its application includes a request to be relieved from compliance with this Court's prior remedial orders. The State also asks that we declare the new SFRA funding formula constitutional. The State made the policy choice to provide state funding to public school districts in the current fiscal year consistent with SFRA.

We cannot give an advisory opinion on SFRA's statewide constitutionality. The *Abbott v. Burke* litigation does not provide this Court with jurisdiction to address the statute's applicability to students not before the Court. However, we do have jurisdiction to determine whether SFRA is constitutional as applied to pupils in the Abbott districts. Moreover, the existing decisions and orders of this Court must serve as the starting point for any discussion of the constitutionality of SFRA as applied to the pupils who are the beneficiaries of those rulings.

Because those decisions have dictated, to date, how a constitutional level of state funding for the pupils in Abbott districts is to be provided, SFRA's constitutionality, which otherwise would be

presumptive, must be approached differently. Through their pending applications the State and plaintiffs ask that we confront the intersection of the Legislature's new funding formula with our prior decisions. In essence, the question is whether the formula should be permitted to replace the funding methodology previously ordered.

## II.

### A. SFRA Development Process

The State's affidavit submissions go into great detail about the process through which it developed the new funding formula embodied in SFRA. We begin, therefore, by summarizing the State's description of that process and the formula it produced.

The State's efforts began in 2003. The State Department of Education (DOE), in conjunction with a consulting firm, Augenblick, Palaich and Associates (APA), decided to use a professionally recognized methodology, known as the Professional Judgment Panel (PJP) approach, in order to develop a new school funding formula.[2] Pursuant to that method, one identifies desired performance standards, then develops prototypical model districts, and finally employs panels of experts to determine the resources needed to reach the selected performance standards in those districts.

The DOE's use of the PJP methodology began with a determination that its performance standards would be the Core Curriculum Content Standards (CCCS), which were deemed in *Abbott IV*, *supra*, to be a reasonable definition of a constitutionally sufficient,

---

[2] The PJP methodology was developed in Wyoming in response to its State Supreme Court's order requiring the state to re-examine its school funding structure. *See Campbell County Sch. Dist. v. State*, 907 P.2d 1238, 1279–80 (Wyo.1995) (directing state to calculate cost of services needed to provide proper education to all students). The PJP method is described as one of four well-established methods for conducting cost studies for education financing, and the most popular for adequacy studies. *See* Silverstein Aff. ¶ 4–5.

thorough and efficient education. 149 *N.J.* at 168, 693 *A.*2d 417. The CCCS's mandated standards embrace nine subject areas, *see* *N.J.A.C.* 6A:8–1.1, which must be reviewed and updated by the State Board of Education every five years. *See L.* 2007, *c.* 260, § 4.

According to the State, to develop prototypical model schools and districts, DOE's consulting firm used data from each district in the State to generate six model districts, which assertedly conform to the demographics of New Jersey school districts. The characteristics reflected in the district models include size, grade span, and percentages of at-risk, Limited English Proficiency (LEP), and special education students.

The DOE next turned to the identification of educational resources needed to meet the CCCS in the six prototype districts. To that end, DOE convened three panels of experts. The first group was comprised of educators within the DOE. That panel made the initial resource recommendations, which became the starting points for the work of the later groups. Panel members were instructed to identify necessary resources and not to be overly constrained by concerns about cost, but they also were counseled not to design their dream school.

The experts comprising the next round of panelists were selected by education-stakeholder groups, and included an ELC representative and representatives from Abbott districts. That panel reviewed and modified the resources identified in the work of the first-round panel. Their work product was adjusted in turn by a third panel of eight district-level administrators, including two superintendents and one business administrator from Abbott districts. The process yielded a set of necessary resources for an elementary, middle, and high school for each model district and included recommendations that were detailed enough to include, for example, specialty teachers for the arts and additional personnel and aides for at-risk or LEP students, as well as summer school and after-school programs for schools having certain percentages of at-risk and LEP students.

The final step involved identifying a base per-pupil amount for general education and similar, identified per-pupil costs that would reflect the services necessary for students having special needs. DOE applied actual-cost data from 2004–2005 to the resources identified as needed by the panels. Salary statistics from data on file with the DOE and the Department of Labor also were used. Applying those costs to the different district and school models, DOE's consultant extracted formulas for estimating the costs needed to achieve the CCCS standards in all districts in the State.

Those findings, and the process used to develop them, were set forth in a December 2006 Report on the Cost of Education (Report). DOE held public hearings, inviting public comment on the Report.[3] That input convinced the DOE to publish a January 2007 Addendum to the Report, updating cost figures with 2005–2006 data.

Also during the public comment time period, DOE retained three experts to review the findings in the report. In sum, they produced a report that recommended the following changes: allocate more resources for professional development; expand the definition of "at-risk" to include students eligible for a reduced-price lunch; use mean, instead of median, salary data; undertake additional research into the cost of substitute pay and employee benefits; employ a newer geographic cost adjustment; and simplify the formula by combining the base amounts for moderate, large, and very large districts.[4]

---

[3] See Report on the Cost of Education, Dec. 11, 2006, available at http://www.nj.gov/education/sff/background.htm.

[4] With those recommended adjustments, the experts' report concluded that the resources identified by DOE would be sufficient to meet the benchmarks for success used by a variety of entities, including satisfaction of the resources in the "illustrative" school budgets described in Abbott v. Burke, 153 N.J. 480, 710 A.2d 450 (1998) (Abbott V). The report also recommended that the State study successful and unsuccessful schools and districts to identify strategies that have been especially successful or unsuccessful. We are informed that the DOE is conducting such a study in partnership with Rutgers University.

Armed with those additional recommendations, DOE began finalizing a funding formula. It convened another panel of experts: one versed in systemic reform and evidence-based practices; one whose background was in teacher retention and early childhood; and the third having expertise in educational finance. Their recommendations, together with the public comments, the previous experts' report, and additional "stakeholder" meetings held between April and December 2007, helped to finalize a new funding formula.

B. Formula Development

DOE decided to base its formula on one model district—the "large" district—out of the original six models. Its rationale for that decision was based on several considerations. It claims that larger districts generally are more efficient and that, therefore, the use of a larger model would provide incentive for the creation of larger, more efficient districts, consistent with the Legislature's preference for such efficiencies. In addition, DOE asserts that large and extra-large districts tend to have more at-risk students, and generally are more likely to reflect the characteristics of a greater number of districts.[5] DOE also weighted students based on grade level to reflect the higher cost of educating middle and high school students.

DOE then applied certain categorical cost-enhancements to the model. Those included: adding $175 per student for capital improvements; adjusting utilities costs to reflect inflation; adding more resources for professional development; increasing funding for instructional aides for districts with at-risk populations of over forty percent;[6] providing for extra security guards in districts that are over forty percent at-risk; and expanding the definition of

---

[5] According to DOE, of the thirty-one Abbott Districts, eleven qualify as extra large, twelve are large, seven are moderate, and one is small.

[6] DOE states that this will enable every kindergarten class in a district that is over forty percent at-risk to have an instructional aide in the classroom.

"at-risk" to include students eligible for both free and reduced-price lunches.

DOE also adjusted the formula to use census or actual-cost data for categories such as salary benefits and vocational schools, and switched from a median to a mean value for the calculation of teachers' salaries. In addition, DOE carved out a third weight for students who qualify as both at-risk and LEP, and enhanced the LEP weight (from .47 to .50). According to DOE, that weight enhancement increases the fiscal resources allocated for LEP students by approximately $300 per student. Additional weights were added for districts with at-risk pupil percentages exceeding sixty percent, according to a sliding scale. Under the adjusted formula, districts with high percentages of at-risk students receive additional funds beyond those needed to support the resources identified through the PJP process.

Finally, DOE expanded the provision of preschool programs and changed the method through which special education is funded. For example, every district is obligated to provide preschool to all three- and four-year-olds who qualify as at-risk, and any DFG A, B, or CD district [7] with a concentration of forty percent or more children must offer full-day preschool to all three- and four-year-olds in that district. That designation includes all Abbott districts except Hoboken, which is classified as DFG FG. Under DOE's proposal, the State will fully fund those per-pupil amounts based on actual enrollment and the funds will be segregated in a special revenue fund.

One of the primary differences between the new formula and prior school funding formulas is that virtually all aid under the new formula is wealth-equalized. Each district contributes to its

---

[7] The DOE classifies school districts according to socioeconomic status. *See generally Abbott IV, supra,* 149 *N.J.* at 155 n. 3, 693 *A.2d* 417 (summarizing DOE's classification system, which is based on ten District Factor Groups (DFGs) identified as A through J). DFG A and B districts are those having the greatest indicia of poverty and, at the other end of this socioeconomic scale, DFG I and J districts comprise the state's most affluent school districts. *Ibid.*

adequacy budget an amount that is based on its ability to raise local revenue. The adequacy budget includes: (1) the base amounts for elementary, middle, and high school students; (2) the additional weights for at-risk, LEP, and at-risk LEP students; (3) two-thirds of the census-based cost for general education; and (4) all census-based costs for speech. It therefore constitutes the vast majority of a district's education expenditures. Adding to that is a district's required local fair share contribution. That amount is calculated by indexing the district's property wealth and aggregate income using statewide multipliers. State equalization aid compensates for the difference between the fair share and the adequacy amount. Categorical aid is then allocated, regardless of a district's ability to raise revenue, to pay for: (1) one-third of the census-based cost for general special education; (2) security aid; (3) preschool aid; and (4) extraordinary aid for special education.

## C. The SFRA

In December 2007, DOE published *A Formula for Success: All Children, All Communities,* which included the weights and costs for the 2008–2009 school year and set forth DOE's final version of its funding proposal. The SFRA generally incorporates that formula, and includes additional structural provisions to address the formula's timeliness and continued efficacy. The SFRA was passed by both houses of the Legislature on January 7, 2008, and signed by the Governor on January 13, 2008.

In terms of 2008–2009 costs, the base amounts for each elementary, middle, and high school student are $9,649, $10,035, and $11,289, respectively. The cost for a full-time vocational student is $14,789. An at-risk weight is assigned on a sliding scale ranging from .47 to .57. According to DOE, the at-risk aid results in an additional $4,535 to $6,435 per student, depending on the concentration of at-risk students in that district. The LEP weight yields an additional $4,825 to $5,645 per pupil. The combined at-risk/ LEP weight, allocated in the same way, generates an additional $5,741 to $7,846 per student. Special education students receive

an excess dollar amount, $1,082 for speech-only special education pupils and $10,898 for other special education pupils.

The SFRA also provides certain aid adjustments. Those adjustments enable districts to receive at least a two-percent increase in State aid for 2008–2009 as they become acclimated to the new formula and, at the same time, the SFRA limits one-year aid increases to "ensure that districts anticipate and plan for optimal use of any significant aid increases." Further, former Abbott districts that have been spending less than their calculated adequacy amounts may be eligible for "Education Adequacy Aid," which is designed to bring each to the spending level necessary to achieve the CCCS standards within three years. DOE claims that the provision of Education Adequacy Aid is an appropriate response to the likelihood that communities with a local tax levy far below their calculated fair share amount will be unable to meet their fair share without some form of state assistance.

The SFRA also imposes a number of systemic requirements. The Governor must generate and present to the Legislature an Educational Adequacy Report every three years. The report must address recommendations for adjustments to: (1) the base per-pupil amount; (2) the per-pupil amounts for full-day preschool; (3) the weights for various special-needs populations; (4) cost coefficients for security aid and transportation aid; and (5) specific identified special education cost information. Unless the adjustments are rejected by the Legislature by November 30th of the reporting year, the SFRA makes them self-executing during the following school year.

In addition, the Commissioner independently is required to study the special education census methodology by June 30, 2010, to determine whether adjustments to that formula are needed. The study must be completed by the time the local levy growth limitation provisions expire. *See L.* 2007, *c.* 62.

D. Plaintiffs' objections to SFRA

Plaintiffs mount numerous challenges to SFRA. Generally stated, plaintiffs' argument is that the funding formula is based on

unproven models and is not based on the actual needs of Abbott districts. They object to the State's failure to produce evidence that it considered the Court-prescribed criteria for Abbott-district designation when developing the SFRA formula and assert that SFRA essentially abandons the Abbott-district designation, without prior Court approval. Thus, plaintiffs contend that, under SFRA, funding to Abbott districts will decline in coming years, undoing the accomplishments achieved in the past.

More specifically, plaintiffs assert that the SFRA is inconsistent with the remedies previously ordered by this Court for the Abbott districts, most especially the parity remedy, the Abbott K–12 supplemental programs remedy, and municipal overburden. They contend that it is the State's burden to demonstrate, as to the parity remedy for example, that the legal standard for supplanting that specific remedy has been met. That standard, they contend, requires that the State first show that spending in the I and J districts is inefficient before any reduction in parity can occur. As for supplemental programs, the plaintiffs similarly argue that the State must show that the SFRA will enable the Abbott districts to meet the needs that currently are met through supplemental needs-based funding. And, as for municipal overburden, plaintiffs contend that the State must demonstrate that municipal burden no longer cripples the Abbott districts' ability to increase tax levies before requiring the districts to raise those levies to the extent SFRA requires.

According to plaintiffs, all those proofs must be made, and convincingly so, before the State may discontinue implementation of the Abbott remedies. Thus, plaintiffs contend that the State's application should be denied or, in the alternative, the matter should be remanded for development of a proper evidentiary record.

## III.

There are several parts to the inquiry that we must undertake in order to resolve the applications before us. We must consider,

first, whether our prior holdings preclude an alternative legislative approach to financial support for a thorough and efficient education; and, second, if not, whether the Court is willing to entertain a different approach. If so, then, the final part to this inquiry must address whether the prior decisions of the Court bar or constrain aspects of the State's alternative funding approach.

### A.

A brief history of certain key decisions in the *Abbott* litigation sheds light on the Court's present ability to answer the first question in the negative. An alternative school funding approach is not precluded by our earlier decisions.

In *Abbott II, supra,* the State presented the Public School Education Act of 1975 (the Act) as a school funding formula that would satisfy the constitutional requirement of a thorough and efficient education. 119 *N.J.* at 295, 575 *A.*2d 359. The Court reviewed the Act after it had been examined through the development of a full record. *Id.* at 295–300, 575 *A.*2d 359. Based on that record, the Court found the funding formula to be constitutionally inadequate. *Id.* at 295, 575 *A.*2d 359. Importantly, the Court further found that "funding alone will not achieve the constitutional mandate" for the pupils in districts having high concentrations of poor children; that "without educational reform, … money may accomplish nothing; and that in these [poorer] districts substantial far-reaching change in education [was] absolutely essential to success." *Ibid.*

The Court ordered the remedy of "certain funding" to be provided to the special needs districts, resorting to the conventional wisdom that money is a factor. *Id.* at 385, 575 *A.*2d 359. The Court used the successful I and J districts—the most affluent suburban districts—as a benchmark it could identify for success. *Id.* at 386, 575 *A.*2d 359. As was later underscored in *Abbott IV, supra,* 149 *N.J.* at 167, 693 *A.*2d 417, the Court in *Abbott II, supra,* looked to those districts it deemed were likely to be providing a level of education that was consistent with the Consti-

tution. 119 *N.J.* at 357–69, 575 *A.2d* 359. The Court ordered that the funding must approximate the average net current expense budgets of the I and J districts, *id.* at 386, 575 *A.2d* 359, acknowledging that expenditure disparity could continue to exist because the I and J districts were not being capped, *id.* at 388, 575 *A.2d* 359. The important point of the remedy was to bring a thorough and efficient education to the poorer urban districts. *Id.* at 385, 575 *A.2d* 359. Further, the court ordered that the funding be adequate to provide for the special educational needs of students in poorer districts. *Id.* at 386, 575 *A.2d* 359.

Four years later, in *Abbott III, supra,* the Court considered the Quality Education Act (QEA), enacted by the Legislature in 1990 in response to *Abbott II.* 136 *N.J.* at 446–47, 643 *A.2d* 575. After a full chancery court hearing was conducted in which the State bore the burden of showing that the new statute complied with the prescriptions for a constitutional funding program set forth in *Abbott II,* the Court declared the QEA unconstitutional. *Id.* at 446–47, 643 *A.2d* 575. The new funding formula failed to implement key aspects of the *Abbott II* decision, which directed that there be certainty in the funding for the special needs districts, among other requirements. *Id.* at 451, 643 *A.2d* 575.

In response to *Abbott III's* rebuff of the QEA funding approach, the State turned its attention to the creation of comprehensive content standards for a thorough and efficient education from which a standard of fiscal support could be built. Thereafter, the Legislature, working with the Executive Branch, enacted the Comprehensive Educational Improvement and Financing Act of 1996 (CEIFA), *L.* 1996, *c.* 138 (codified at *N.J.S.A.* 18A:7F–1 to –33).

In *Abbott IV, supra,* the Court addressed the constitutionality of CEIFA, declaring upon examination of the statute's educational content provisions that, with the enactment of CEIFA, the Legislature had taken a major step in detailing the components and meaning of a constitutional education, an effort that "strongly warrant[ed] judicial deference." 149 *N.J.* at 167–68, 693 *A.2d* 417.

The Court ultimately concluded that the CCCS established in CEIFA provided a constitutionally acceptable definition of a thorough and efficient education. *Id.* at 168, 693 *A.*2d 417.

That said, the Court was unable to approve the fiscal standards adopted in CEIFA to support the CCCS because the standards were based on costs in a hypothetical school district that supposedly served as a model for all school districts. *Id.* at 163, 693 *A.*2d 417. The Court noted that the "model" did not account for the characteristics of special needs districts. *Id.* at 172, 693 *A.*2d 417. Furthermore, the Court also found that those special needs were not adequately provided for through CEIFA's categorical aid for supplemental programs—demonstrable effective program aid (DEPA)—because DEPA funding also was not calculated based on a study of the special needs of the high concentrations of poor students attending Abbott districts. *Id.* at 185, 693 *A.*2d 417. Thus, the Court was forced to conclude that the State had not demonstrated an adequate basis for using the per-pupil funding amounts for supplemental programs. *Ibid.*[8]

Faced with no viable alternative legislative or administrative solution to the funding dilemma, the Court ordered the parity remedy. *Abbott IV, supra,* 149 *N.J.* at 189, 693 *A.*2d 417. The Court resorted to the I and J district average as an objective and reasonable indicator of resources needed to achieve the CCCS. *Id.* at 191–92, 693 *A.*2d 417. The parity remedy was recognized, even at the time, as an "interim" remedy, albeit the Court's "chosen interim remedy." *Id.* at 190, 693 *A.*2d 417. The door was left open, however, for an alternative funding approach. The Court allowed that the Legislative and Executive Branches could devise an adequate alternative funding remedy so long as the State could show, convincingly, that a thorough and efficient education can be met through expenditures lower than parity, or if the State

---

[8] The Court also concluded that the State had failed to address the need for facilities improvement. *Id.* at 186–88, 693 *A.*2d 417.

showed that the I and J districts' spending contained inefficiencies. *Id.* at 196, 693 *A.*2d 417.

Thereafter, in *Abbott V, supra,* following an extensive hearing before a special master appointed by the Court, the Court directed the implementation of whole school reform and otherwise settled details about the supplemental programs that would be required for pupils in special needs districts, now designated as "Abbott districts." 153 *N.J.* at 489, 508–19, 527–28, 710 *A.*2d 450.[9] *Abbott V* also required a remedy for the extensive facility needs found to exist in such districts. *Id.* at 527–28, 710 *A.*2d 450.

## B.

Except for individual years in which a freeze on State funding forced economies in the operation of the funding scheme ordered by *Abbott IV* and *Abbott V,* the State has abided by the Court-ordered parity remedy enhanced by supplemental funding to the Abbott districts. That scheme was in place until SFRA was enacted. Plaintiffs take the position that the State must prove a lack of need for the funds currently going to the support of I and J districts in order to displace parity with SFRA or any other funding scheme. The State takes the entirely different approach of asserting that, with SFRA, it has built a school funding formula from the ground up, applicable for all districts, taking into account and incorporating sufficient budgetary support for special needs within Abbott districts and in other districts where concentrations of poor, at-risk children generate similar special needs.

We would agree with plaintiffs if we viewed the parity remedy as the only means by which this Court could envision a constitutional funding scheme, but we do not. It was one—but not the sole—means to achieve a constitutional funding scheme. The parity order was chosen because of the absence of any other "measuring stick" by which to gauge the necessary educational

---

[9] *Abbott V* later was modified to allow additional options. *Abbott v. Burke,* 177 *N.J.* 578, 586–87, 832 *A.*2d 891 (2003) (*Abbott X*).

resources for the CCCS to be provided in districts having large concentrations of poor children within their pupil population. Our prior decisions and orders did not preclude experimentation and consideration of alternative approaches to an equitable and constitutional funding approach. On the other hand, the Court has never abdicated its responsibilities to plaintiffs and will not do so now.

We approach the matter before us mindful that all three branches of government have a shared purpose—to achieve for all students compliance with the constitutional command for a thorough and efficient education. The legislative findings in the preamble to the SFRA declare as much and profess that years of diligent effort in a careful and deliberate process have produced a unitary funding approach that has identified the resources needed by all districts to provide a constitutionally sufficient program of education consistent with CCCS standards. *See L.* 2007, *c.* 260, § 2. Specifically, the Legislative and Executive Branches claim to have developed a formula that adjusts for the unique special needs of all districts with higher concentrations of at-risk and LEP students and that, accordingly, the Abbott district remedies are no longer needed.

We begin our consideration of the applications before us by declaring that another funding approach may prove constitutionally satisfactory. That said, it is the State's obligation to demonstrate that it has produced an equitable funding formula—one it describes as being applicable to all districts based on size, regional costs, and the characteristics of the district—that can ensure Abbott districts have sufficient resources to enable them to provide a thorough and efficient education, as defined by the CCCS standards. Our prior remedial orders require no less. By that, however, we do not mean that the formula must produce the equivalent in an exact dollar amount to that which parity/supplemental-program funding would have provided to be constitutional.

In its motion before the Court, the State robustly asserts that the SFRA formula provides all districts, including Abbott districts,

with sufficient funds to deliver a constitutionally adequate education by providing sufficient support for the CCCS standards. The State contends that SFRA's fiscal standards are not hampered by the shortcomings that originated from CEIFA's model-school-district approach to the CCCS. According to the State's submissions, it has taken a more nuanced and layered approach to the calculation of "sufficient" aid by district, which includes a means for accounting for the "at-risk" cost attributable to the educational and social challenges occasioned by concentrated pupil poverty. It also asserts that SFRA adjusts, in numerous other ways, to the various types of needs faced by large and small school districts as a whole, and by schools of differing population size and grade configuration in urban as well as rural district settings.

 Certainly there exist, in this state, districts other than Abbott districts that are challenged in their provision of a thorough and efficient education because they have concentrated populations of poor, at-risk children with exceptional educational and social needs. The State's desire to step back and take a hard look at its whole approach to school funding is reasonable and responsible, particularly when the cost of public funding for education comprises such an overwhelming portion of the State's annual budget. However, until the State demonstrates to our satisfaction that a constitutionally adequate education can be provided to Abbott district students through the funding that will be provided via SFRA, the State is bound to comply with the prior remedial orders and decisions respecting the plaintiffs in Abbott districts.

Because the State's assertions that its revised funding scheme is constitutional are supported only by affidavits that are challenged by opposing affidavits from plaintiffs and by submissions of the amici Abbott districts, we are unable to resolve the matter on the present record. The question is not suited to summary disposition. We have, therefore, determined to remand the matter for the development of an evidential record. Live testimony and cross-examination will be required to resolve disputed matters of fact. The burden of proof shall be on the State, as it has been

each time the State has advanced a new funding program that it has asserted to be compliant with the thorough and efficient constitutional requirement.

## C.

In this instance, the remand issue is limited. The Court has already held the CCCS standards to be constitutional. At this time, the issue to be resolved is whether the State has overcome the deficiencies found in CEIFA's funding provisions as applied to Abbott districts. To answer that question, we must know how the State's new formula will accommodate Abbott pupils' resource needs through the calculation of the base cost of regular education and as supplemented by the "at-risk" and other costs.[10] The new formula must be examined specifically to determine whether the special needs of disadvantaged students can be met sufficiently through the SFRA's orderly and planned approach to addressing special needs, with all the benefits that such deliberate planning provides. That demonstration also will need to address the reasonableness of allowing SFRA's approach to replace the open-ended, individual-district-needs-based approach to such fiscal needs that has evolved through the current method of supplemental-program funding.

Because our prior decisions and orders shall remain in effect during the pendency of the remand and until the Court approves an alternative funding program for the Abbott districts, we require maintenance of funding to the Abbott districts consistent with those standards. In the Court's consideration of the State's request to be relieved immediately from continued compliance with the existing remedial orders, we note, however, that the State informed us that the Abbott districts are funded in the 2009 fiscal year at 102% of the 2008 fiscal year's funding level for each

---

[10] We understand that facility needs are not part of plaintiffs' present challenge. It appears that the SFRA does not call into question compliance with our prior orders in respect of that State obligation.

district. That information compels us to add that we consider that level of funding for any individual Abbott district to be presumptively sufficient for the current year.

Nevertheless, pending our review of the record to be developed on remand, we are reluctant to deprive the Abbott districts of the opportunity to demonstrate that, within the limits of their current year funding, they are incapable of providing a thorough and efficient education. Therefore, we hold that the remand shall not preclude any Abbott district from attempting such a demonstration to rebut the presumption of sufficient current year funding.

## IV.

The matter is remanded to a special master to be appointed by Order of the Court. The proceedings on remand shall be expedited. Jurisdiction is otherwise retained.

*For remandment*—Justices LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—5.

*Opposed*—None.

## ORDER

This matter having come before the Court on the application of defendants (collectively, "the State") for a determination that the School Reform Funding Act of 2008 (SFRA) is constitutional (M–969) and the application of plaintiffs for an Order that preserves the "status quo" in funding and that declares all of the Court's prior remedial orders remain in force;

And the Court having granted applications for leave to file *amicus curiae* briefs on behalf of designated Abbott districts and other interested entities [11];

---

11 *Amici* include the following: Urban Mayors' Association; Association for Children of New Jersey; Alliance for the Betterment of Citizens with Disabilities, The Brain Injury Association of New Jersey, New Jersey Protection & Advocacy,

And the Court having heard oral argument on the motions from the State and counsel for plaintiffs;

And the Court having determined that it is unable to resolve the disputed issues of fact between the parties concerning the constitutionality of SFRA in the absence of a testimonial record;

And good cause appearing;

IT IS ORDERED that the within matter is remanded to Superior Court Judge Peter E. Doyne, sitting as a Special Master, to conduct a plenary hearing to develop a full and complete evidential record that addresses the factual contentions raised by the parties and *amici curiae* before this Court; and it is further

ORDERED that the Special Master shall permit *amicus curiae* participation by any Abbott district that is not already in the within matter, provided such district submits appropriate moving papers within twenty-one days of the filing date of this Order; and it is further

ORDERED that the examination and cross-examination of witnesses at the hearings shall be limited to counsel for the State and plaintiffs; and it is further

ORDERED that the burden is on the State to prove that SFRA's funding formula provides sufficient resources to enable the Abbott districts, with their special needs in respect of the at-risk pupils entrusted to their care, to deliver a thorough and

Inc., New Jersey Special Education Practitioners, Special Education Clinic at Rutgers University School of Law–Newark and Special Education Leadership Council of New Jersey; Millville Board of Education; New Jersey Education Association; Vineland Board of Education; Camden City School District; Boards of Education of City of Bridgeton, City of Burlington, City of East Orange, City of Elizabeth, Gloucester City, Keansburg Borough, Jersey City Public Schools, City of Passaic, State–Operated School District of Paterson, Pemberton Township, City of Perth Amboy, Town of Phillipsburg, and City of Trenton; New Jersey Black Issues Convention; State–Operated School District of the City of Newark; Hispanic Directors Association of New Jersey; and Dollar$ and Sense.

efficient education, as defined by the Core Curriculum Content Standards; and it is further

ORDERED that plaintiffs and *amici* shall have the burden of proof on the factual issues that relate to their specific claims of current year inadequate school funding; and it is further

ORDERED that the Special Master shall conduct the hearings on an expedited basis and shall file a report on his factual findings and conclusions with the Court within sixty days of the completion of the hearings; and it is further

ORDERED that the Court shall thereafter determine a supplemental briefing schedule for the parties and, if deemed appropriate, *amici curiae.*

Jurisdiction is otherwise retained.

Justices LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO, and HOENS join in the Court's Order. Chief Justice RABNER and Justice LONG did not participate.