966 A.2d 1054 (2009)
198 N.J. 274
EDUCATION LAW CENTER, On Behalf of Abbott v. Burke Plaintiff Children, Plaintiff-Respondent,
v.
NEW JERSEY DEPARTMENT OF EDUCATION, Defendant-Appellant.
A-100 September Term 2007
Supreme Court of New Jersey.
Argued October 21, 2008.
Decided March 26, 2009.
*1057 Nancy Kaplen, Assistant Attorney General, argued the cause for appellant (Anne Milgram, Attorney General of New Jersey, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Melissa T. Dutton, Deputy Attorney General, on the brief).
Eric A. Stone argued the cause for respondent (David G. Sciarra, Executive Director, Education Law Center, attorney; Mr. Stone, Elizabeth Ann Athos, Jersey City and Koren Larissa Bell, admitted pursuant to R. 1:21-3(c), of counsel and on the brief).
Justice LaVECCHIA delivered the opinion of the Court.
This case began with a demand for the production of documents held by the State Department of Education (DOE). The requesting party was the Education Law Center (ELC), the representative of pupils in the State's poorest school districts who are involved in litigation with DOE over a revised state funding formula for public education. Although thousands of documents were released, an issue remains as to whether a single document containing allegedly deliberative material may be withheld by DOE from public release based on the deliberative process exemption in the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13, and under a balancing of interests based on common law right-of-access principles.
The document is a memorandum prepared by DOE that outlines state aid simulation results for three school funding formula structures. DOE generated the memorandum during the process that culminated in the enactment of the "School Funding Reform Act of 2008" (SFRA), L. 2007, c. 260. DOE has claimed that OPRA's express exemption for "deliberative materials" authorizes the withholding of the memorandum. DOE also contends that its interest in maintaining confidentiality over this material used during DOE's deliberative policy-making activities outweighs the requestor's common law interest in access.
Rejecting DOE's arguments, both the trial court and the Appellate Division ordered the memorandum's release. See Education Law Center v. N.J. Dep't of Educ., 396 N.J.Super. 634, 639, 644, 935 A.2d 858 (App.Div.2007). The Appellate Division held that the memorandum, which contains factual material, is not "deliberative," id. at 640-42, 935 A.2d 858, and therefore does not qualify for OPRA's exemption *1058 of deliberative process material, ibid. The panel also ordered the document's release under a common law right-of-access balancing of the interests. Id. at 644, 935 A.2d 858. We granted DOE's motion for leave to appeal, 194 N.J. 258, 944 A.2d 22 (2008), to consider the appropriate test for examining the application of deliberative process protection, under OPRA and under a right-of-access analysis, for a document that contains a presentation of data. Specifically, we address the privilege as applied in the context of a document containing factual data that has been formatted to create scenarios to assist in an agency's consideration of policy options.
We hold that a record, which contains or involves factual components, is entitled to deliberative-process protection when it was used in the decision-making process and its disclosure would reveal deliberations that occurred during that process. By that standard, an individual document may not be capable of being determined to be, necessarily, deliberative material, or not, standing alone. A court must assess such fact-based documents against the backdrop of an agency's deliberative efforts in order to determine a document's nexus to that process and its capacity to expose the agency's deliberative processes.

I.
The plaintiff-requestor, ELC, represents children who are plaintiffs in related, ongoing litigation focused on the adequacy of State funding for education to the poorest of New Jersey's school districts. See Abbott v. Burke, 196 N.J. 544, 960 A.2d 360 (2008). Recently, the State enacted the revised school funding formula contained in SFRA, which is under current challenge by the litigants represented by plaintiff. See ibid. The defendant DOE was instrumental in the development of the new formula codified in SFRA. DOE engaged in a lengthy process to develop a revised scheme of funding distribution to school districts, during which it created several iterations of a formula for funding distribution before providing recommendations to the Legislature.
In May 2006, ELC filed its OPRA request for the disclosure of records "related to the ... estimate, review and/or analyses of the cost of providing a thorough and efficient education undertaken by the Office of School Funding." In response, DOE released more than 900 pages of documents, albeit some partially redacted. ELC thereafter filed a complaint in the Law Division, claiming that the redactions violated OPRA and the common law right of access to government documents.
In light of the narrowness of the present appeal, focusing as it does on a single memorandum, there is no need to detail the numerous rulings by the trial court presiding over this dispute. Suffice it to say that a series of letter opinions demonstrates that the court painstakingly waded through the documents. One document that the trial court reviewed, and concluded should be released, is the disputed memorandum, which is titled "Alternative Funding Formula Simulations." The document was prepared in October 2003, and served as an internal document for the Office of School Funding, which is part of DOE. A redacted copy of that document had been released to ELC. The document, twelve pages in length, outlines three school funding options. After describing the options in outline form, the memorandum details statistical data run through each of the formulas to determine what certain costs would be for each alternative. The redacted version of the document omits that statistical information for two of the three alternatives outlined and *1059 discussed in the memorandum. Since the beginning of this litigation, that particular document has been referred to as the "Simulation Memo," which we will use hereinafter.
When ordered to release an un-redacted copy of the Simulation Memo, DOE appealed. The appeal focused on whether the Simulation Memo was sufficiently "deliberative process" material to have merited exemption under OPRA's deliberative process carve-out. Similarly, DOE argued that the trial court incorrectly weighed DOE's interest in nondisclosure of that asserted deliberative process material, resulting in an improper balancing of the interests under the common law.
In respect of OPRA, the panel observed that the document must meet two criteria. First, it must have been "generated before the adoption of an agency's policy or decision." Education Law Center, supra, 396 N.J.Super. at 640, 935 A.2d 858 (citing Gannett N.J. Partners v. Middlesex, 379 N.J.Super. 205, 219, 877 A.2d 330 (App.Div.2005)). Finding that prong of the analysis clearly to have been met, the panel turned to the second prong and found that DOE failed to establish that the Simulation Memo constituted deliberative material:
In our judgment, the material at issue is numerical and statistical in nature. While the figures and calculations may illustrate different potential impacts of the differing funding structures, we cannot fairly categorize the redacted material as "containing opinions, recommendations or advice."
[Id. at 641, 935 A.2d 858.]
In so holding, the panel rejected DOE's argument that "the formulation of the numerical and statistical material contained within the Simulation Memo is the product of judgments made by staff of the Department and is thus inherently deliberative." Id. at 641, 935 A.2d 858. The panel's right of access analysis dovetailed with its analysis of the deliberative nature of the document under OPRA. Id. at 644, 935 A.2d 858. Because it did not credit DOE's claim that the document constituted deliberative material, when the panel balanced the parties' interests under the common law, it found that two important factors in that analysis  the potential for chilling effect on government and the degree to which the information contains factual data versus evaluative reports  weighed against DOE and in favor of the document's release. Ibid.
This case plainly hinges on how the document in dispute is evaluated. In this appeal we must determine the appropriate test for when an agency of government asserts deliberative process protection for a document containing data that, according to the requestor, renders the document "factual," not "deliberative," in nature.

II.

A.
New Jersey can boast of a long and proud "tradition[] of openness and hostility to secrecy in government." North Jersey Newspapers v. Passaic County Bd. of Chosen Freeholders, 127 N.J. 9, 16, 601 A.2d 693 (1992). Our well-established common law protection of a citizen's right to access, see Loigman v. Kimmelman, 102 N.J. 98, 505 A.2d 958 (1986), is complemented by the Legislature's enactment of OPRA, which was intended to enhance the citizenry's statutory rights to government maintained records. See N.J.S.A. 47:1A-1 to -13.
In Mason v. City of Hoboken, in the course of a thorough review of OPRA's procedures for the release of public documents, this Court acknowledged the plain *1060 intent of New Jersey's newest public records statute "to insure that government records, unless exempted, are readily accessible to citizens." 196 N.J. 51, 57, 951 A.2d 1017 (2008); see N.J.S.A. 47:1A-1. OPRA's clear purpose, we explained, is "to maximize public knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process." Mason, supra, 196 N.J. at 64, 951 A.2d 1017 (internal quotations omitted). The statute employs a straightforward means to accomplish its goal. Ibid. OPRA declares that it shall be our public policy to require that government records "be readily accessible for inspection, copying, or examination by the citizens of this State, with certain exceptions, for the protection of the public interest." N.J.S.A. 47:1A-1.
A "government record" is broadly defined. See N.J.S.A. 47:1A-1.1.
A "government record" includes "any paper, written or printed book, document, drawing, map, plan, photograph, microfilm, data processed or image processed document, information stored or maintained electronically or by sound-recording or in a similar device, or any copy thereof." To be considered a "government record," an item must be maintained or received in the course of official business by an "officer, commission, agency, or authority of the State or of any political subdivision."
[Mason, supra, 196 N.J. at 65, 951 A.2d 1017 (quoting N.J.S.A. 47:1A-1.1).]
That said, OPRA excludes twenty-one categories of information, making the public's right of access not absolute. N.J.S.A. 47:1A-1.1. In that listing of excluded categories, the Legislature has made the public policy determination to exempt material used in governmental deliberations from those documents that must be made available for public scrutiny. This appeal focuses on that exclusion.
OPRA exempts from the definition of "government record" documentary information that constitutes "inter-agency or intra-agency advisory, consultative, or deliberative material." Ibid. That exemption language, like exemption five to OPRA's federal counterpart, the Freedom of Information Act (FOIA), 5 U.S.C. § 552, has, from its inception, been understood to encompass the common law deliberative process privilege.[1]See Fisher v. Div. of Law, 400 N.J.Super. 61, 74, 946 A.2d 53 (2008); Gannett, supra, 379 N.J.Super. at 219, 877 A.2d 330. Accordingly, our courts have turned to federal deliberative process jurisprudence, where such law chiefly has developed, for guidance in ascertaining the scope of OPRA's deliberative process exemption. See, e.g., Fisher, supra, 400 N.J.Super. at 74, 946 A.2d 53; Gannett, supra, 379 N.J.Super. at 219, 877 A.2d 330;[2]see also In Re Liquidation of Integrity *1061 Ins. Co., 165 N.J. 75, 83, 754 A.2d 1177 (2000) (turning to federal common law standards on deliberative process privilege when recognizing privilege to be part of our common law and establishing its parameters and procedures).
Thus, in order to address the dispute over whether the Simulation Memo may be considered deliberative material, we turn to the purpose of the privilege intended to be served by the incorporation of a deliberative material exclusion in OPRA.

B.
The deliberative process privilege "permits the government to withhold documents that reflect advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated." Integrity, supra, 165 N.J. at 83, 754 A.2d 1177 (citing NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29, 47 (1975)). The essence of the privilege is simple, its rationale built on powerful logic. As explained by Justice Reed when introduced for use in the federal courts, the privilege is necessary to ensure free and uninhibited communication within governmental agencies so that the best possible decisions can be reached:
Free and open comments on the advantages and disadvantages of a proposed course of governmental management would be adversely affected if the civil servant or executive assistant were compelled by publicity to bear the blame for errors or bad judgment properly chargeable to the responsible individual with power to decide and act. Government from its nature has necessarily been granted a certain freedom from control beyond that given the citizen. It is true that it now submits itself to suit but it must retain privileges for the good of all.
[Kaiser Aluminum & Chem. Corp. v. United States, 141 Ct.Cl. 38, 157 F.Supp. 939, 945-46 (1958).]
The justification for a deliberative process privilege also arises out of the desire to prevent disclosure of proposed policies before they have been fully vetted and adopted by a government agency, see Jordan v. United States Dep't of Justice, 591 F.2d 753, 773 (D.C.Cir.1978) (explaining that privilege is designed to ensure that agency is judged by policy adopted, not policy merely considered), as well as the desire to prevent the confusion that could result from release of information concerning matters that do not bear on an agency's chosen outcome, see id. at 772-73.
This Court addressed the deliberative process privilege in Integrity. In addition to officially recognizing the privilege that had enjoyed long acceptance in the federal courts, we set standards for its application. Integrity, supra, 165 N.J. at 84, 754 A.2d 1177. First, the document must be "pre-decisional," which means that "it must have been generated before the adoption of an agency's policy or decision." Ibid. Second, we said that the document must be deliberative; explaining that such documents "contain opinions, recommendations, or advice about agency policies." Id. at 84-85, 754 A.2d 1177.
Once the threshold requirements have been proved by the government, the privilege is invoked, resulting in a presumption of confidentiality because the "government's interest in candor is the preponderating policy and ... the balance is said to have been struck in favor of non-disclosure." *1062 Id. at 85, 754 A.2d 1177 (internal quotations omitted). Because the privilege is a qualified one, a litigant can still obtain the requested materials upon a showing that the need for the materials overrides the government's interest in confidentiality. Ibid. At that point, the burden is on the litigant to demonstrate such a compelling need: "[I]n all but exceptional cases it is considered against the public interest to compel the government to produce inter-agency advisory opinions." Ibid. (quoting E.W. Bliss Co. v. United States, 203 F.Supp. 175, 176 (N.D.Ohio 1961)). In making the determination whether a litigant has demonstrated an overriding need, a court should consider the following factors: "(1) the relevance of the evidence; (2) the availability of other evidence; (3) the government's role in the litigation; and (4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." Id. at 85-86, 754 A.2d 1177.
Although we emphasized in Integrity that "the government, like its citizens, `needs open but protected channels for the kind of plain talk that is essential to the quality of its functioning,'" id. at 88, 754 A.2d 1177 (quoting Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, 40 F.R.D. 318, 325 (D.C.Cir.1966)), we also said that "[p]urely factual material that does not reflect deliberative processes is not protected," id. at 85, 754 A.2d 1177 (citing Mink, supra, 410 U.S. at 88, 93 S.Ct. at 837, 35 L.Ed.2d at 132). That comment reflected the widely accepted notion that strictly factual material should not be confidential because the disclosure of such material would not chill free communication and deliberation due to the static nature of facts as compared to the dynamic nature of opinions. Mink, supra, 410 U.S. at 88, 93 S.Ct. at 837, 35 L.Ed.2d at 132.
As our only decision to touch on the subject, Integrity has been the Rosetta stone for questions arising about the deliberative process privilege in New Jersey, and has been repeatedly relied on by our courts when the government has sought to invoke the privilege. See, e.g., Fisher, supra, 400 N.J.Super. at 74, 946 A.2d 53; Gannett, supra, 379 N.J.Super. at 219, 877 A.2d 330; In Re Readoption with Amendments of Death Penalty Regulations, 367 N.J.Super. 61, 73, 842 A.2d 207 (App.Div.2004); Paff v. Dir., Office of Attorney Ethics, 399 N.J.Super. 632, 646, 945 A.2d 149 (Law Div.2007). That said, Integrity did not address and, therefore, did not explore how to determine precisely when material is "deliberative," in those instances involving statistical and like data that have factual components, but may project opinions or expose an agency's deliberations or reasoning process.
In order to answer that question, the deliberative process privilege must be examined in greater detail. As we did when adopting the privilege in Integrity and establishing standards used in the federal common law, we again turn to federal law for assistance.

C.
In Mink, supra, the Supreme Court of the United States examined a claim brought by members of Congress under FOIA to obtain government documents containing recommendations to the President regarding underground nuclear testing. 410 U.S. at 75, 93 S.Ct. at 830, 35 L.Ed.2d at 125-26. The Court analyzed the legislative history of exemption five, which incorporates the deliberative process privilege, and noted the public policy of "open, frank discussion between subordinate and chief concerning administrative action." Id. at 87, 93 S.Ct. at 836, 35 L.Ed.2d at 132 (internal quotation omitted). *1063 The Court explained that that underlying policy was emphasized during legislative deliberations:
It was pointed out in the comments of many of the agencies that it would be impossible to have any frank discussion of legal or policy matters in writing if all such writings were to be subjected to public scrutiny. It was argued, and with merit, that efficiency of Government would be greatly hampered if, with respect to legal and policy matters, all Government agencies were prematurely forced to "operate in a fishbowl."
[Ibid. (citing S.Rep. No. 813, p. 9).]
The Court also explained that Congress was concerned with "whether production of the contested document would be `injurious to the consultative functions of government that the privilege of nondisclosure protects.'" Ibid. (quoting Kaiser, supra, 157 F.Supp. at 946).[3]
Turning to the documents at issue in the case before it, the Court denominated them a "blend[] of factual presentations and policy recommendations that [were] necessarily inextricably intertwined with policymaking processes." Mink, supra, 410 U.S. at 92, 93 S.Ct. at 838, 35 L.Ed.2d at 134-35 (internal quotation marks omitted). Based on that determination, and in light of the legislative concerns expressed when exemption five to FOIA was enacted, the Court concluded that "the very purpose of the [deliberative process] privilege, the encouragement of open expression of opinion as to governmental policy" could be impaired simply by requiring an in camera review of the documents, and adjusted the relief ordered. Id. at 93, 93 S.Ct. at 839, 35 L.Ed.2d at 135 (quoting Kaiser, supra, 157 F.Supp. at 947).
Two years later, in Sears, supra, another FOIA case, the Supreme Court considered whether advice and appeals memoranda prepared by general counsel for the NLRB had to be disclosed. 421 U.S. at 136, 95 S.Ct. at 1509, 44 L.Ed.2d at 39. Again, the Court analyzed exemption five of FOIA under common law deliberative process jurisprudence and also examined the legislative history of FOIA. Id. at 149-50, 95 S.Ct. at 1516, 44 L.Ed.2d at 46-47. The Court explained that deliberative process jurisprudence "uniformly rest[s] the privilege on the policy of protecting the decision making process of government agencies and focus[es] on documents ... comprising part of a process by which governmental decisions and policies are formulated." Id. at 150, 95 S.Ct. at 1516, 44 L.Ed.2d at 48 (internal quotations omitted). The Court emphasized the importance of honest discourse because, otherwise, the decisions of government agencies would be "poorer." Ibid. "`Human experience teaches that those who expect public *1064 dissemination of their remarks may well temper candor with a concern for appearances... to the detriment of the decisionmaking process.'" Id. at 150-51, 95 S.Ct. 1504 (quoting United States v. Nixon, 418 U.S. 683, 705, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039, 1062 (1974)). Ultimately, the Court concluded that the "ingredients of the decisionmaking process" must not be disclosed." Id. at 151, 95 S.Ct. at 1517, 44 L.Ed.2d at 48.
Since the seminal cases of Mink and Sears, the federal circuit and district courts have adhered to the same parameters and procedures for the deliberative process privilege, but have disagreed over the very question presented by this case: What exactly is "deliberative" as required by the second prong of the analysis? Different tests have emerged concerning what is and is not "deliberation," and "deliberative" material, when facts infiltrate the documents in issue, clouding the line between "opinion" and "fact."
The United States Court of Appeals for the Eleventh Circuit formulated its test for determining the breadth of "deliberation" in Florida House of Representatives v. Dep't of Commerce, 961 F.2d 941 (11th Cir.1992). In that case, the House of Representatives of Florida filed a request under FOIA for the release of adjusted block level census data. Id. at 943. The Secretary of the Department of Commerce invoked exemption five of FOIA, claiming that the information was exempt from disclosure because of the deliberative process privilege. Ibid. The Eleventh Circuit Court of Appeals adhered to a "fact" versus "opinion" dichotomy, explaining that "the distinction between `factual' and `opinion' data ... `requires different treatment for material reflecting deliberative or policy-making processes on the one hand, and purely factual, investigative matters on the other.'" Id. at 947 (quoting Mink, supra, 410 U.S. at 89, 93 S.Ct. at 837, 35 L.Ed.2d at 133). However, the court acknowledged that "the task of drawing a line between what is fact and what is opinion can at times be frustrating and perplexing." Ibid.
The Eleventh Circuit explained that some courts had questioned the continued vitality of the "fact/opinion" distinction because of dissatisfaction arising when the disclosure of "facts" would reveal an agency's deliberative process. Id. at 947-48. Accordingly, when elaborating on its test, the court emphasized that "[t]he only inquiry that should be made in deciding whether something should be denoted opinion, and hence deliberative, is: Does the information reflect the give-and-take of the consultative process?" Id. at 949. When applying its test in the case before it, the court found that the final adjusted block level data at issue was a "proposal or a recommendation that eventually was rejected by the person in charge," id. at 949-50, and therefore constituted an opinion. The court cautioned against the tendency automatically to treat all numbers, because of their "surface precision," as "fixed" in nature:
[Although] of course some areWaterloo was fought in 1815. But cost estimates... are far from fixed, as anyone knows who has had two contractors bid on a home improvement or has compared budget estimates with final costs of a government project. They derive from a complex set of judgmentsprojecting needs, studying prior endeavors and assessing possible suppliers. They partake of just that elasticity that has persuaded courts to provide shelter for opinions generally.
[Id. at 950 (internal quotations omitted).]
Because the adjusted numbers in its case constituted a recommendation that was rejected "in a process which ultimately led to *1065 the Secretary accepting a different recommendation as his final decision," ibid., the court characterized the statistical data as opinion data, and shielded it from disclosure based on the deliberative process privilege encompassed in exemption five of FOIA, ibid.
The United States Court of Appeals for the Ninth Circuit took a different approach in Assembly of the State of California v. Dep't of Commerce, 968 F.2d 916 (9th Cir. 1992). The facts of that case mirrored the facts in Florida House, but the Ninth Circuit adopted a different analysis, explaining that the main purpose of the deliberative process privilege is to ensure that agencies do not have to "operate in a fishbowl." Id. at 921. Toward that end, the Ninth Circuit explained that courts should focus on the effect of potential disclosure by asking whether "the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." Ibid. (internal quotation omitted).
The Ninth Circuit disclaimed the "fact/opinion" test espoused by the Eleventh Circuit, id. at 922 n. 3, but acknowledged that "[t]he factual/deliberative distinction survives ... as a useful rule-of-thumb favoring disclosure of factual documents, or the factual portions of deliberative documents where such separation is feasible," id. at 921. Applying its own "functional test," see Nat'l Wildlife Fed'n v. U.S. Forest Serv., 861 F.2d 1114, 1118-19 (9th Cir.1988), the court concluded that the material "in no way divulges the reasoning process through which [it] was derived or in any way explains any recommendation or decision not to adjust the census," Assembly of California, supra, 968 F.2d at 922.[4]
Adding to the mix of tests, the D.C. Circuit took its turn at formulating a fitting inquiry for when factual material constitutes deliberative process material. In Mapother v. Dep't of Justice, 3 F.3d 1533, 1535 (D.C.Cir.1993), the D.C. Circuit decided a case in which the Department of Justice fought disclosure of a document, prepared for the Attorney General by the Office of Special Investigations, that detailed the wartime activities of Kurt Waldheim, the former Secretary-General of the United Nations and former President of Austria. That document provided the basis for an order by the Attorney General barring Waldheim from the United States because of possible participation in war crimes as an officer in the Nazi army. Ibid. The claim was brought under FOIA, and the Department of Justice invoked exemption five due to the deliberative process privilege. Ibid.
Taking a fresh approach, the D.C. Circuit rejected application of a simplistic "fact/opinion test." Explaining that it found the test inadequate, the court stated, "while offering a quick, clear, and predictable rule of decision, [it] is not infallible and must not be applied mechanically ... because the privilege serves to protect the deliberative process itself, not merely documents containing deliberative material." Id. at 1537 (internal quotations omitted). Instead, the court elaborated on its own *1066 "test" formulated by then-Judge Ginsberg in Petroleum Info. Corp. v. Dep't of the Interior, 976 F.2d 1429, 1439 (D.C.Cir. 1992), stating that "[w]here an agency claims that disclosing factual material will reveal its deliberative processes, we must examine the information requested in light of the policies and goals that underlie the deliberative process privilege." Mapother, supra, 3 F.3d. at 1537-38 (internal quotation omitted). The court explained that withholding disclosure of material of a factual nature may be warranted to avoid "expos[ure of] an agency's policy deliberations." Ibid.
The D.C. Circuit noted that in a prior decision, it had permitted an agency to withhold factual summaries of an administrative proceeding under the rationale that
[t]o probe the summaries of record evidence would be the same as probing the decision-making process itself. To require disclosure of the summaries would result in publication of the evaluation and analysis of the multitudinous facts made by the Administrator's aides and in turn studied by him in making his decision.... In effect, the litigants seek to know what advice as to importance and unimportance of facts the Administrator received, and how much of it he accepted.... The work of the assistants in separating the wheat from the chaff is surely just as much part of the deliberative process as is the later milling by running the grist through the mind of the administrator. And that some wheat is thrown away and some chaff included with the grain does not alter the nature of the process.
[Ibid.]
Based on its emphasis on the privilege's intended effect to protect plainly deliberative material as well as the deliberative process, the court determined that most of the material in the case before it, which constituted factual summaries, should be privileged because it was revealing of the deliberative process even though the material could be characterized as having factual components. Ibid. The D.C. Circuit Court explained that the key was the relationship between the requested material and its capacity to expose the deliberative efforts by which the agency reached its ultimate decision. Id. at 1539.

III.

A.
Our deliberative process jurisprudence began with our incorporation of the federal rationale and, in respect of the finely poised question of how courts of this state should determine what may qualify as "deliberative" under the second prong of the deliberative process test established in Integrity, we again find federal jurisprudence helpful. In particular, we find the D.C. Circuit Court's approach, and reasoning, persuasive.
As this case illustrates, a label-heavy, but analytically simplistic, test of "fact" versus "opinion" ill-equips a court faced with the difficult task of determining what is and is not deliberative material when a document includes factual information. In truth, it is not the existence of a "fact" that should strip a document used in governmental deliberation from the protection of the privilege. Rather, a court must recognize the difference between factual material that is part of the formulation, or exercise, of policy-oriented judgment from factual material that is not. Because of "the need for deliberation to inform discretion and for confidentiality to protect deliberation," Mapother, supra, 3 F.3d at 1539, we are convinced that the key to identifying deliberative material must be how closely the material (including the selection of "factual" or "informational" material) *1067 relates to the "formulation or exercise of... policy-oriented judgment or [to] the process by which policy is formulated," ibid. (internal quotation marks and emphasis omitted). Deliberative material need not, in all instances, expressly reflect an overt opinion, recommendation, or advice when a discretionary decision is in development. And, pre-decisional documents do not lose their protection from unwarranted public scrutiny merely because they may contain numerical or statistical data or information used in the development of, or deliberation on, a possible governmental course of action. As the D.C. Circuit Court aptly stated, the deliberative process privilege "was intended to protect not simply deliberative material, but also the deliberative process of agencies." Id. at 1538 (emphasis added).
Thus, the question of what is protected under the deliberative process privilege, incorporated into OPRA as an exemption from the definition of a "government document," must depend, first, on whether the information sought is a part of the process leading to formulation of an agency's decision, (not on a simplistic label of "fact" or "opinion,"), and, second, on the material's ability to reflect or to expose the deliberative aspects of that process. We reach our conclusion for several reasons.
The privilege is intended to protect the deliberative process. The privilege recognizes the importance of promoting government's full and frank discussion of ideas when developing new policies, or in examining existing policies and procedures, and further recognizes that such activities constitute a process of policy examination and evaluation. See Sears, supra, 421 U.S. at 151 n. 18, 95 S.Ct. at 1517 n. 18, 44 L.Ed.2d at 44 n. 18.[5] The word "process" commonly means "a systematic series of actions directed to some end." Webster's New College Dictionary (2d ed.1986). The mere use of the word "process" in the name of the privilege suggests that the material can include factual components and still be protected from disclosure if it was used in the agency's efforts to reason through to an ultimate decision, including a decision to reject all options and not to act. So long as disclosure of such material would reveal the nature of the deliberations that occurred during the agency's processes, the material is entitled to the protection of the deliberative process privilege.
In addition to the D.C. Circuit's forceful statement on that point, case law in this area refers to the agency's decision-making "process." See Dep't of the Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8, 121 S.Ct. 1060, 1065, 149 L.Ed.2d 87, 95 (2001) (noting that deliberative process covers "documents ... comprising part of a process by which governmental decisions and policies are *1068 formulated") (internal quotation omitted) (emphasis added); Sears, supra, 421 U.S. at 150-151, 95 S.Ct. at 1516-17, 44 L.Ed.2d at 47-48 (explaining that cases interpreting privilege "uniformly rest ... on the policy of protecting the decision-making processes of government agencies" and that communications affecting agency decisions will not be affected as long as "ingredients of the decisionmaking process are not disclosed") (internal quotations omitted)(emphasis added); United States v. Ernstoff, 183 F.R.D. 148, 152 (D.N.J.1998) (explaining that deliberative process privilege intended to "prevent injury to the quality of agency decisions which could result from premature or indiscriminate disclosure of deliberations comprising part of a process by which government decisions and policies are formulated") (emphasis added). Our own state's jurisprudence on the privilege emphasizes the concept of a "process." See Integrity, supra, 165 N.J. at 83, 754 A.2d 1177 (explaining that privilege deals with "part of a process by which governmental decisions and policies are formulated") (internal quotation omitted) (emphasis added); Atlantic City Convention Ctr., supra, 135 N.J. at 62, 637 A.2d 1261 (same); Paff, 399 N.J.Super. at 648, 945 A.2d 149 (explaining that privilege "protects communications that are part of the decision making process of a governmental agency") (emphasis added).
Indeed, although it was not the precise point of the analysis on which we were focusing, even in Integrity, supra, we alluded to the need for a more careful analysis of "factual" material. 165 N.J. at 85, 754 A.2d 1177. When we said that "[p]urely factual material that does not reflect deliberative processes is not protected," ibid., that comment was not meant to establish a rigid dichotomy such that all material that could be classified as "opinion" is confidential whereas all material that could be classified as "factual" must be disclosed. Rather, as the statement itself suggests, factual material that reveals the nature of the decision-making process is protected. That approach, implicit in Integrity, animates the rule announced today: that the deliberative nature of the material sought must be functionally determined based on the document's nexus to the decision-making process and its capacity to expose the agency's deliberations during that process. It must not pivot on a purely semantic exercise of labeling documentary matter as "fact" or "opinion."[6] We will not follow mechanistically a seemingly straightforward "fact/opinion" test, which has resulted in courts having to force a square peg into a round hole to avoid its absurd applications. See Florida House, supra, 961 F.2d at 948 (expressing dissatisfaction with "fact/opinion" test's outcome in certain applications).
Indeed, the ambiguity in the "fact/opinion" test is demonstrated in this matter. Both parties asserted that Quarles v. Dep't of the Navy, 893 F.2d 390 (D.C.Cir.1990), supported their arguments. Quarles involved a claim by a reporter from an Alabama *1069 newspaper for the disclosure of cost-estimate materials relating to the Navy's selection of homeports for ships in a new battleship group. Id. at 391. The D.C. Circuit explained that "purely factual material" must be disclosed, id. at 392, but noted that "[e]ven when requested material is found to be factual, the courts have held it exempt where they were convinced that disclosure `would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions,'" ibid. (quoting Dudman Commc'ns Corp. v. Dep't of the Air Force, 815 F.2d 1565, 1568 (D.C.Cir.1987)). Several other cases that similarly applied the deliberative process privilege under FOIA also were cited, all of which had found that the requested factual material was privileged because of its capacity to reveal the nature of the deliberations and deliberative activities. Ibid. (citing Wolfe v. HHS, 839 F.2d 768, 773 (D.C.Cir.1988); Lead Indus. Ass'n v. OSHA, 610 F.2d 70, 85 (2d Cir.1979); Washington Research Project v. HEW, 504 F.2d 238, 250-51 (D.C.Cir.1974); Montrose Chem. Corp. v. Train, 491 F.2d 63, 71 (D.C.Cir.1974)).
Because it felt constrained by the "fact/opinion" language sprinkled throughout deliberative process jurisprudence, the D.C. Circuit explained why the numerical data in the case before it was more akin to opinion than fact by noting, among other things, its elasticity and reliance upon judgment. Id. at 392-93. However, the court then expressed its grave concern about the impact that disclosure of the numerical data could have.
If a study team found significant potential savings in deploying the battleship group at a finalist port otherwise deemed satisfactory, disclosure of the finding surely would tend to undermine the acceptabilityamong taxpayersof forsaking that option. Yet the Navy might have reasons for rejecting the seemingly cheaper option, perhaps strategic, perhaps political....
Disclosure of the [cost] estimates ... might unleash forces that would effectively preclude any alternative other than the one supported by the cost projections, just as deliberate leaks often skew the decisionmaking process. Again, the prospect of such disclosure would increase the incentives to lower officials' fudging such estimates, or to higher-ups' not even calling for them.
[Id. at 393 (internal citations and emphasis omitted).]
The D.C. Circuit's concern represented the chief justification for instituting the deliberative process privilege, namely promoting truthful communications during the process of decision making. That concern plainly motivated the court's decision to label the numerical data, which was fundamentally factual in nature, as "opinion" in order to ensure that it was protected as part of the deliberative process of the Navy. By eschewing such labels, we aim to prevent our courts from losing sight of the key reason for the privilege: to protect the process of decision-making itself so that the best possible decisions may emanate from government.
To conclude, therefore, we hold that a record, which contains or involves factual components, is subject to the deliberative process privilege when it was used in the decision-making process and its disclosure would reveal the nature of the deliberations that occurred during that process. By that standard, individual documents may not be capable of being determined to be, necessarily, deliberative material, or not, standing alone. A court must assess such fact-based documents against the backdrop of an agency's deliberative *1070 efforts in order to determine a document's nexus to that process, and its capacity to expose the agency's deliberative thought-processes.

B.
In the case at bar, the Simulation Memo consists of statistical projections used in calculating various approaches to local share contributions under differing alternatives for school funding. Using a series of hypothetical assumptions, the statistical projections in the Simulation Memo were derived from different potential formulas. Through a vast culling process, involving the many moving parts that go into a school funding formula, the agency sought to decide what to recommend to the Governor and to the Legislature as the best course of action. DOE could have chosen any or none of the alternatives outlined in the Simulation Memo when composing a new funding structure. The agency's ultimate decision aside, the Simulation Memo clearly was created and used during the deliberative process employed by DOE.
Merely because the hypothetical funding considerations used in the Simulation Memo involved the computer generation of numbers and figures from neutral, or raw, factual information concerning New Jersey municipalities does not preclude the document from being determined to constitute deliberative material. Here the formatted data provided DOE with a means of illustrating the results of alternative hypothetical options, making the document plainly integral to the agency's process of deliberation.
Nor is the document exempted from protection under deliberative process because none of the alternatives from the Simulation Memo was chosen. The Memo was created for use, and was used during DOE's deliberations. Furthermore, the fact that a new funding formula now has been chosen, and disclosed, does not obviate the need to maintain confidentiality of the decision-making process in order to ensure free deliberative communication within government in the future. If communication that formed part of an agency's pre-decisional process could be disclosed after the decision has been released, one of the major justifications for the privilege in the first placemaintaining the free flow of communication within an agency would be rendered meaningless. Just as in Quarles, release of all pre-decisional informational tools used by DOE in the course of its deliberative activities could chill, in the future, the robust examination of governmental courses of action.
The opinion below reflects inordinate weight being given to the "fact/opinion" characterization. The decision says that the Simulation Memo "illustrat[ed] different potential impacts of the differing funding structures," but concludes that one could not "fairly categorize the redacted material as containing opinion[s], recommendations, or advice." However, labeling the Simulation Memo's contents as "fact" or "opinion" is not determinative of this matter. Had the redacted Memo been recognized for what it contains, namely data organized into scenarios created specifically by DOE for use during its deliberations, then examination of the document should have revealed its patent ability to reveal what people were thinking when certain selections were being made, or not made.
In sum, as we view the document, the Simulation Memo contained factual data converted into scenarios for the purpose of assisting in the agency's consideration of options. This was not raw, neutral, data. It was manipulated to provide organized information useful to the DOE, specifically for the purpose of aiding the agency in *1071 deciding on an aspect of a new funding scheme. It plainly was created during, and used as part of, DOE's deliberative process. As for the second part of the examination for deliberative-process protection, the document must be capable of reflecting what people were thinking and considering during the process of deliberating. This Memo, concerning data created specifically to provide information that DOE deemed useful during its decision-making process, shows that persons were using the formatted data for the purposes of ascertaining something to be decided. The document is, therefore, reflective of DOE's deliberations. As such, it is entitled to protection under the deliberative process privilege and, therefore, is exempt from release under OPRA.
To conclude, then, we hold that DOE was entitled to withhold the document under OPRA's provision that excludes from the definition of a "government record" documents that constitute "deliberative material."

IV.
ELC independently brings a claim for disclosure of the Simulation Memo under the common law right of access. Despite the enactment of OPRA, the Legislature explicitly provided that the common law right still exists. N.J.S.A. 47:1A-8 (stating that "[n]othing contained in [OPRA]... shall be construed as limiting the common law right of access to a government record"). Therefore, ELC's claim under the common law right also must be analyzed.
The common law right can reach a wider array of documents than its statutory counterpart. Higg-A-Rella, Inc. v. County of Essex, 141 N.J. 35, 46, 660 A.2d 1163 (1995). The trade-off is that, "[u]nlike a citizen's absolute statutory right of access, a plaintiff's common-law right of access must be balanced against the State's interest in preventing disclosure." Ibid. The common law right of access involves a two-step inquiry. Ibid. First, a litigant must establish an interest in the public record. Ibid.; see also N. Jersey Newspapers Co. v. Passaic County Bd. of Chosen Freeholders, 127 N.J. 9, 13, 601 A.2d 693 (1992) (defining public record as something "made by public officers in the exercise of public functions" (internal quotation omitted)). "The requisite interest necessary to accord a plaintiff standing to obtain copies of public records may be either `a wholesome public interest or a legitimate private interest.'" Higg-A-Rella, supra, 141 N.J. at 47, 660 A.2d 1163 (quoting Loigman, supra, 102 N.J. at 112, 505 A.2d 958).
Once the first step has been satisfied, then, to gain access, a plaintiff's interest in disclosure of the relevant documents must outweigh the State's interest in non-disclosure. Id. at 47-48, 660 A.2d 1163. In making that determination, courts are to consider the following factors:
(1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers; (5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by *1072 the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials.
[Loigman, supra, 102 N.J. at 113, 505 A.2d 958.]
In the present case, neither party disputes that ELC had an interest in obtaining the Simulation Memo, as a result of the ongoing Abbott litigation between the two parties.[7] What is in dispute, however, is whether the lower courts properly applied the Loigman factors to balance ELC's need for disclosure against DOE's need for non-disclosure. DOE argues that the lower courts' conclusion that the Simulation Memo is non-deliberative invalidates its common law analysis because the factors could not be appropriately considered. We agree.
The Simulation Memo was an essential part of the process employed by DOE in reaching its decisions about a revised school funding formula. Understanding that is critical to any proper weighing of the impact of Loigman factors one through four. The detrimental impact that disclosure would have on DOE's deliberative process would impede agency functions by discouraging open and frank discussion and recommendations from agency employees to those higher up in DOE's hierarchy now and in the future. Manipulations of data to assess and consider the impact of variations in school funding do not make documents showing such results less "deliberative" in the give and take among departmental administrators working on alternatives for superior-level policymakers. The Memo here has been found to reflect the agency's deliberations in selections or choices under consideration. We have no doubt that disclosure of the Simulation Memo, created during the process of DOE's deliberative and developmental activities associated with a revised approach to school funding, and reflective of persons' thinking on matters to be ascertained in the decision-making deliberations, presents the danger of chilling future program improvement and other agency decision-making.
In conclusion, the decision belowin respect of the degree to which the Simulation Memo was found to contain factual data versus evaluative reportingwas skewed by a misinterpretation of the document as non-deliberative. Once proper weight is applied to the first four Loigman factors, it cannot be said that ELC's interest in obtaining disclosure of the Simulation Memo, which constitutes a generalized citizen's interest in the document, but not a private need to the document, outweighs DOE's interest in non-disclosure. Therefore, we hold that ELC's claim for access to the Simulation Memo via the common law right must fail.

*1073 V.
For the foregoing reasons, the judgment of the Appellate Division is reversed and the matter is remanded to the Law Division for entry of an Order consistent with this opinion.
For reversal and remandment Justices LONG, LaVECCHIA, ALBIN, WALLACE and HOENS5.
OpposedNone.
NOTES
[1] FOIA mandates that government agencies make available to the public a broad array of information, subject to several exemptions. Ibid. One exemption applies to "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The language of that exception also has been interpreted to encompass, among other things, the deliberative process privilege; federal case law therefore has applied deliberative process jurisprudence from the federal common law in connection with that exemption. See Envtl. Prot. Agency v. Mink, 410 U.S. 73, 91, 93 S.Ct. 827, 838, 35 L.Ed.2d 119, 134 (1973) (explaining that "[e]xemption 5 contemplates that the public's access to internal memoranda will be governed by the same flexible, common-sense approach that has long governed private parties' discovery of such documents involved in litigation with Government agencies").
[2] In addition to the express reference to deliberative material, which is understood to embrace the deliberative process privilege that has developed in the federal law, OPRA also directs state custodians of public records to deny access to documents that are exempt from disclosure under federal law. See Gannett, supra, 379 N.J.Super. at 214, 877 A.2d 330.
[3] In a footnote, the Court elaborated on the legislative history of exemption five of FOIA, explaining that it had been significantly broadened during its course through the Senate. Id. at 91 n. 17, 93 S.Ct. at 837 n. 17, 35 L.Ed.2d at 133 n. 17. In its original form, the exemption applied only to internal memoranda "`relating to the consideration and disposition of adjudicatory and rulemaking matters.'" Ibid. (quoting S. 1666, 88th Cong., 2d Sess., § 3(c) (1964) (introduced in 110 Cong. Rec. 17086)). However, that original formulation was criticized for "not sufficiently protecting material dealing with general policy matters not directly related to adjudication or rulemaking." Ibid. The Court highlighted two such criticisms: (1) the Federal Aviation Administration (FAA) argued that "[f]ew records would be entirely devoid of factual data, thus leaving papers on law and policy relatively unprotected. Staff working papers and reports prepared for use within the agency of the executive branch would not be protected," ibid. (quoting 1965 Senate Hearings 446); and (2) the Department of Commerce suggested that "[u]nder this provision, internal memorandums [sic] dealing with mixed questions of fact, law and policy could well become public information," ibid. (quoting 1965 Senate Hearings 406) (emphasis omitted).
[4] Although the court determined that disclosure of the adjusted block census date would not reveal anything about the process informing the Secretary's judgment, the court also emphasized that most of the decisional process had already been voluntarily revealed by the Department of Commerce when it disclosed the method used to generate its adjusted census data. Id. at 923. Therefore, the court opined that "disclosing the adjusted census figures would not reveal anything more about the deliberative process than has already been disclosed by the agency." Ibid.
[5] A strong analogy can be made to the work-product privilege, which similarly reflects an understanding that deliberative work, at its best, requires an expectation of privacy to allow for the efficient, unrestrained development of thoughts and their frank examination. See Hickman v. Taylor, 329 U.S. 495, 510, 67 S.Ct. 385, 393, 91 L.Ed. 451, 463 (1947) (noting that "a certain degree of privacy, free from unnecessary intrusion" was essential for development of lawyer's thoughts and work). Courts assessing claims of deliberative process privilege for material that "loosely" may be characterized as factual due to its having a "factual component," have emphasized that the deliberative process privilege values the role of privacy in the process of decision-making. Mapother, supra, 3 F.3d at 1538. Thus, the D.C. Circuit noted that judges need only look at our own work to recognize the importance of privacy to the process of deliberation. See ibid. (observing that "courts have long looked by analogy to the needs of their own decision-making processes to assess claims of privilege based on the needs of executive decision-making") (internal quotation marks and citation omitted).
[6] As noted earlier, despite its asserted adherence to the "fact/opinion" test, the Eleventh Circuit engages in a more generous analysis of deliberative process material than those labels suggest. As a result, the court broadly has included material that has played a part in an agency's decision-making process as an "opinion," regardless of whether the material is of a factual nature. See Florida House, supra, 961 F.2d at 948 (noting difficulty with strict "fact/opinion" dichotomy when disclosure of facts reveals agency's deliberative process). Thus, notwithstanding its application of a so-called "fact/opinion" test, the Eleventh Circuit is able to conclude that material imbued with factual contents is an "opinion." Id. at 949-50.
[7] That said, DOE challenges ELC's claim to a private interest in the Simulation Memo that arises due to the current litigation between the ELC and the DOE. DOE argues that ELC's pending litigation concerns the adequacy of the SFRA funding scheme and the Simulation Memo does not contain information supportive of the SFRA funding choices. Rather, it addresses alternatives that were not incorporated into the SFRA. Therefore, DOE asserts that the information in the Memo is not needed for the advancement of ELC's challenge to the SFRA formula that was enacted. We agree with DOE and, therefore, for purposes of the balancing of interests, see Higg-A-Rella, supra, 141 N.J. at 47-48, 660 A.2d 1163, will treat ELC's interest as a generalized one, like that of any citizen with a "`wholesome public interest'" in the information, id. at 47, 660 A.2d 1163 (quoting Loigman, supra, 102 N.J. at 112, 505 A.2d 958).