70 A.3d 744

GEORGE OYOLA AND AUDREY OYOLA, PLAINTIFFS–RESPONDENTS, v. XING LAN LIU, WEYNA CHEN, CONSUMER FIRST INSURANCE COMPANY, DEFENDANTS, AND NEW JERSEY PROPERTY–LIABILITY INSURANCE GUARANTY ASSOCIATION, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued April 30, 2013—Decided July 15, 2013.

Before Judges ALVAREZ, WAUGH and ST. JOHN.

*Mark M. Tallmadge* argued the cause for appellant (*Bressler, Amery & Ross,* attorneys; *Mr. Tallmadge,* on the briefs).

*James J. Mahoney* argued the cause for respondents (*James J. Mahoney, P.C.,* attorneys; *Mr. Mahoney* and *Xavier A. Nuñez,* on the brief).

The opinion of the court was delivered by

ALVAREZ, J.A.D.

In this appeal, defendant New Jersey Property–Liability Insurance Guaranty Association (Association) seeks reversal of the grant of summary judgment to plaintiffs George Oyola (Oyola) and

Audrey Oyola (together referred to as the Oyolas). The Association was ordered to pay to Oyola, on behalf of an insolvent insurer, $85,000 for injuries Oyola sustained in a motor vehicle accident. The Association contends that under New Jersey's Property–Liability Insurance Guaranty Association Act (Act), *N.J.S.A.* 17:30A–1 to –20, the amount of workers' compensation and other benefits received by Oyola, which exceed the Association's maximum liability for the claim, although less than Oyola's damages, should result in extinguishing any liability the Association might have towards his loss. Because we conclude, as did Judge Dennis F. Carey, III, that the workers' compensation and other payments should be offset only against the insured's total damages in calculating the Association's obligation to pay, we affirm.

The facts and circumstances which give rise to the Oyolas' claim can be briefly summarized. On January 12, 2009, while Oyola was operating a flatbed truck in the course of his employment, he was struck and seriously injured by a vehicle driven by defendant Xing Lan Liu and owned by Weyna Chen. As a result, the Oyolas filed suit against Chen and Liu. That claim was resolved by payment of Chen's available liability policy maximum of $15,000.

The Oyolas were insured by Consumer First Insurance Company (Consumer First), including $100,000 in underinsured motorist coverage. The Oyolas also named Consumer First in their complaint, seeking underinsured motorists benefits. The Oyolas' policy provided that coverage would be reduced by the amount paid by the party "legally responsible" for the accident, or in this case $15,000, the amount available through the responsible driver's coverage.

Consumer First, however, was declared insolvent in 2009 and was subsequently dismissed from the proceedings by stipulation. Thus on May 9, 2011, the Oyolas amended their complaint to join the Association as a direct party, alleging that pursuant to *N.J.S.A.* 17:30A–8(a)(1), it was "obligated to the extent of the covered claims against an insolvent insurer." In other words, the

Oyolas sought from the Association the $85,000 otherwise payable by Consumer First.

As of June 15, 2012, Oyola's workers' compensation carrier paid $158,940.69 in medical expenses and $12,133.42 in indemnity expenses for a total of $171,074.11 on Oyola's behalf. A final disability determination is still pending. The parties have stipulated that Oyola's total damages will exceed recovery from solvent insurers, including workers' compensation, by at least $85,000.

The parties moved for summary judgment in August 2012. The Association contended that it was relieved of any responsibility to make payment on Oyola's claim because the workers' compensation benefits exceeded the Association's obligation. It relied on the 2004 amendments to the Act in support of the argument. The Oyolas took the contrary position, that even after workers' compensation credits were applied to their total damages, the Association was obligated to satisfy their claim because their losses exceeded the $85,000 otherwise payable under their Consumer First policy.

Judge Carey stated in a cogent and thoughtful oral decision that the 2004 amendments to the Act did not overturn our Supreme Court's interpretation of the relevant sections of the Act in *Thomsen v. Mercer–Charles*, 187 *N.J.* 197, 901 *A.*2d 303 (2006). Although the claim in *Thomsen* was pre-amendment, Judge Carey explained that the case nonetheless controlled:

> nothing in [the] changes ... would lead ... this [c]ourt, at least, to believe that the purpose of the changes were to affect what, basically, is the *Thomsen* Court's opinion of the model act....
>
> ....
>
> ... I don't see that the language has crystalized this issue ... [or] makes it clear that the interpretation that the [L]egislature wants is the one that is suggested by the [Association] ... based on the credit language that now appears in [*N.J.S.A.* 17:30A–5]. I don't think that [the language] significantly changes the analysis that is contained in the *Thomsen* case such that as a trial court ... my ruling should disagree with what is contained in the Supreme Court [decision].

## I

On appeal, the Association contends the trial judge erred in his interpretation of the statutory language, in violation of the intent and public policy behind the 2004 legislative amendments.

Our standard of review is well-established. Appellate review of a trial judge's conclusions of law is de novo. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995). Consequently, we review this grant of summary judgment de novo because it presents a purely legal question, applying the same standard governing the trial court under *Rule* 4:46–2(c). *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 539–40, 666 *A.*2d 146 (1995); *Chance v. McCann,* 405 *N.J.Super.* 547, 563, 966 *A.*2d 29 (App.Div.2009) (citing *Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A.,* 189 *N.J.* 436, 445–46, 916 *A.*2d 440 (2007)). Under this standard, we must grant summary judgment in favor of the moving party

If the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to judgment or order as a matter of law.

[*R.* 4:46–2(c).]

## II

The Association focuses its argument on *N.J.S.A.* 17:30A–5, which states: "[t]he amount of a covered claim payable by the [A]ssociation shall be reduced by the amount of any applicable credits." The Association construes that language to mean the amount of a covered claim must be offset against its maximum statutory obligation to the claimant.

This precise argument was rejected in *Thomsen, supra,* 187 *N.J.* at 211, 901 *A.*2d 303. In *Thomsen,* the claimant was involved in a catastrophic accident. *Id.* at 201, 901 *A.*2d 303. He settled with a responsible party for the maximum insurance amount payable in the aggregate, $2,000,000, or $1,000,000 under each of two separate policies. *Id.* at 202, 901 *A.*2d 303. Only $1,000,000

was paid, however, because the second insurer was declared insolvent before satisfying its portion of the claim. *Ibid.* In that case, as in this, the Association took the position that because the $1,000,000 payment plaintiff received from the solvent insurer exceeded the Act's $300,000 statutory maximum, it owed nothing. *Ibid.*

· Finding the relevant statutory language ambiguous, the Court said:

> Despite the Association's protestations to the contrary, the language at issue is susceptible to more than one interpretation.... The issue is whether the setoff applies to the entire amount payable on the person's loss, thereby reducing or perhaps eliminating the person's claim of damages before he or she need turn to the Association for satisfaction of the remainder, or whether the solvent insurer's payment is applied directly to the statutory maximum that the Association may pay on a "covered claim." Under the latter interpretation, the amount of the claimant's damages claim is only relevant to the extent it is less than the $300,000 statutory cap. Thus, the latter interpretation substantially minimizes tort victims' ability to recover their damages.
>
> [*Id.* at 207–08, 901 *A.*2d 303].

In analyzing the question, the Court turned to the Act's legislative history, remedial purpose, and precedents from other jurisdictions interpreting comparable sections of their version of the law, which is based on the Post–Assessment Property and Liability Insurance Guaranty Association Model Act (Model Act) drafted by the National Association of Insurance Commissioners (NAIC). Ultimately, the Court concluded "that when an insured is covered by both a solvent and an insolvent insurer and the solvent insurer has paid the insured an amount exceeding the Act's maximum payment, but which falls short of the insured's total damages, the insured may seek compensation from the Association." *Id.* at 211, 901 *A.*2d 303. As the Court said, although protecting the Association's funds is important, that concern does "not override the purpose of providing relief to a plaintiff who will not be wholly compensated due to the insolvency of an insurer and who will not be receiving a duplication of benefits...." *Ibid.*

We follow the same course in construing the meaning of the relevant language in this case, which was only slightly altered by

the 2004 amendment to the Act. The variation in wording between the provision interpreted in *Thomsen* and the applicable post-amendment section is minimal. The phrase in *Thomsen* was "[a]n amount payable on a covered claim," (pre-amendment *N.J.S.A.* 17:30A–12(b)), versus the current "[t]he amount of a covered claim payable." *N.J.S.A.* 17:30A–5. The two phrases are virtually indistinguishable, and the language in the amendment in no way indicates that it was intended to overrule *Thomsen.*

It is noteworthy that "the legislative history of the amendment [to the Act] includes a statement indicating that the amendment's purpose was 'to clarify what types of claims are covered and the types of claims, damages and expenses which are not covered by the act.'" *ARCNET Architects, Inc. v. N.J. Property–Liability Ins. Guar. Ass'n,* 377 *N.J.Super.* 102, 110, 871 *A.2d* 728 (App.Div. 2005) (quoting *Senate Commerce Committee, Statement to Senate Committee Substitute for S. 702 and 1580* (May 17, 2004)); *see also Sponsor's Statement, S. 1580* (May 10, 2004) and *Assembly Financial Institutions and Insurance Committee, Statement to Assembly Committee Substitute for A. 2462 and 2873* and *Statement to Senate Committee Substitute for S. 702 and 1580* (Sept. 23, 2004) (describing purpose of revision in identical terms).

The Senate and Assembly documents state that "[t]he purpose of the act, as amended by the bill, is to minimize financial loss to claimants or policyholders because of the insolvency of a property or casualty insurer." *Sponsor's Statement, Senate Commerce Committee Statement,* and *Assembly Financial Institutions and Insurance Committee Statements, supra.* As with the pre-amendment Act, the stated purpose of this remedial legislation continues to be to compensate plaintiffs affected by an insurer's insolvency. The definition of "exhaust" was not discussed at all. *Ibid.*

After noting revisions to the definition of "covered claim," the legislative history indicates that "[t]he most noteworthy change" to that portion of the Act was "eliminating as a 'covered claim' any first party claim by an insured whose net worth exceeds $25 million on December 31 of the year prior to the year in which the

insurer becomes insolvent." *Sponsor's Statement, supra.* It does not refer to any legislative interest or even awareness of a need to clarify whether offsets are to be applied against a claimant's damages or the amount of his recovery from other sources. The legislative history does not mention *Thomsen.*

The sponsor's statement and committee statements affirm that "[i]n many cases, these revisions are designed to align the act more closely with the provisions of the ... model act." *Sponsor's Statement, Senate Commerce Committee Statement,* and *Assembly Financial Institutions and Insurance Committee Statement, supra.* The exhaustion sections of the Model Act were not amended between 1996, when the Legislature added Section 12(b) to the Act, and 2004, when the Legislature removed the offset provision from Section 12(b) and added the definition of "exhaust" to Section 5. *L.* 1996, *c.* 156; *L.* 2004, *c.* 175; *Proceedings of the NAIC,* LH–540–12 (April 2011). Nor have these provisions of the Model Act been amended since the Court in *Thomsen* observed that its adoption served "to encourage consistency in approach in the legislative language and its application." *Thomsen, supra,* 187 *N.J.* at 210, 901 *A.*2d 303.

The Model Act has, since at least 1969, included two options for a sub-provision addressing the ambiguity at issue. *NAIC Model Laws, Regulations & Guidelines 540–1,* Section 14A(2) (current through Release No. 101 (Nov. 2012)). The Legislature has adopted neither provision. *See L.* 1974, *c.* 17; *L.* 1996, *c.* 156; *L.* 2004, *c.* 175. Thus we conclude that the 2004 amendment's legislative history does not assist in answering the question raised by this case.

### III

The Association supports its construction of the relevant language by a "split" in the decisional law in other jurisdictions. All of the cited cases, however, were decided, with one exception, prior to *Thomsen.* In fact, we note that in *Thomsen,* the Court took the position that its interpretation was "consistent with the nearly

unanimous approach taken by our sister jurisdictions." *Thomsen, supra,* 187 *N.J.* at 210–11, 901 *A.*2d 303.

The Association cites in support of its position *Leitch v. Mississippi Insurance Guaranty Association,* 27 *So.*3d 396, 398 (Miss. 2010). Admittedly, the Supreme Court of Mississippi interpreted the State's equivalent statutory provision to mean that amounts payable on a covered claim offset any recovery their counterpart to the Association might have to make. *Id.* at 401. But the statutory language at issue in *Leitch* is precisely the same as the pre–2004 language of our Act. It is therefore equally clear that *Leitch* does not advance the Association's position, because *Thomsen* controls, given that the language is precisely the same.

## IV

The Association also argues that the interpretation of the language made by the trial judge violated legislative intent and public policy. To the contrary, as the Court said in *Thomsen,* its interpretation of the Act "is consistent with the understanding that the Act is remedial legislation deserving of liberal construction." *Thomsen, supra,* 187 *N.J.* at 211, 901 *A.*2d 303. The fund exists to compensate insureds for losses resulting from an insurer's insolvency. In this case, but for the insolvency, the Oyolas would be entitled to the $85,000 payment. Consistent with our understanding that the Act is remedial legislation designed, in part, to "minimize financial loss to claimants" and deserving of liberal construction, compelling the Association to pay only advances the Act's legislative purpose.

## V

We do not address the Association's final argument that the anti-subrogation language of the Act also bars the Oyolas' claims. The Oyolas assert that the Association did not raise this issue at summary judgment and are therefore barred from raising it on appeal. *See Nieder v. Royal Indem. Ins. Co.,* 62 *N.J.* 229, 234, 300 *A.*2d 142 (1973) (stating "appellate courts [generally] will

decline to consider questions or issues not properly presented to the trial court."). We agree. Although the issue was mentioned in a footnote in the Association's brief, it was not addressed at oral argument because it was not briefed. Accordingly, we will not address the merits of the argument.

Affirmed.