NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2573-15T2

MARC LARKINS, ACTING STATE
COMPTROLLER, STATE OF NEW
JERSEY, OFFICE OF THE STATE
COMPTROLLER,

     Plaintiff-Respondent,

v.

GEORGE J. SOLTER, JR.,
SUPERINTENDENT, NORTH BERGEN
DISTRICT BOARD OF EDUCATION
and NORTH BERGEN DISTRICT
BOARD OF EDUCATION,

     Defendants-Appellants.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **June 15, 2017** |
| **APPELLATE DIVISION** |

Argued June 6, 2017 — Decided June 15, 2017

Before Judges Yannotti, Fasciale and Gilson.

On appeal from Superior Court of New Jersey, Chancery Division, Hudson County, Docket No. C-108-15.

Michael D. Witt argued the cause for appellants (Chasan, Leyner & Lamparello, P.C., attorneys; Mitchell L. Pascual, Cheyne R. Scott and Mr. Witt, of counsel and on the briefs).

James A. Carey, Jr., Deputy Attorney General, argued the cause for respondent (Christopher S. Porrino, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Paul Davis, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

FASCIALE, J.A.D.

Defendants George J. Solter, Jr., Superintendent (Superintendent), North Bergen District Board of Education (NBBOE), and the NBBOE, appeal from two December 22, 2015 orders: one granting summary judgment to plaintiff Marc Larkins, Acting State Comptroller (the State Comptroller), State of New Jersey, Office of the State Comptroller (the OSC); and the other denying defendants' cross-motion to compel production of documents. Defendants also appeal from a February 11, 2016 order denying reconsideration of the orders.

The State Comptroller established objective criteria, gathered voluminous information, and weighed various factors before deciding to conduct a performance audit of the NBBOE. Defendants insisted that the State Comptroller was obligated to disclose his reasons for the audit before it commenced. As a result, they conditioned their cooperation on receiving that information.

In entering the orders, the judge determined the parties' obligations by interpreting N.J.S.A. 52:15C-1 to -24 (the Act or Enabling Statute). Based on his review of the Act, the judge concluded that the State Comptroller had no obligation to explain his reasons for the audit. Pursuant to N.J.S.A. 52:15C-

14(a), the judge compelled defendants to fully assist and cooperate with the audit.

The legal issue presented on appeal is whether the State Comptroller was obligated to disclose his reasons for selecting the NBBOE for a performance audit before commencing the audit.[1] We hold that the Enabling Statute does not impose any such requirement. To hold otherwise would undermine the purpose of the Act; render meaningless an auditee's unambiguous statutory obligation to provide full assistance and cooperation with any audit; and unduly delay the conduct of audits. We therefore affirm.

## I.

We begin by summarizing the State Comptroller's role, responsibility, and broad administrative powers. Doing so informs our holding that the State Comptroller is not obligated to justify, in advance of the audit, his reasons for selecting the NBBOE for the performance audit. Undertaking this summary provides further support for our conclusion that imposing such a condition would substantially undermine the State Comptroller's independent oversight role in safeguarding efficient and independent public financial control and accountability statewide.

---

[1] The performance audit is ongoing.

In 2007, the Legislature recognized that the size of governmental agencies had been steadily growing for decades because of new and escalating societal needs. N.J.S.A. 52:15C-1. Although the size of governmental agencies and authorities had been expanding, the Legislature acknowledged that the State's ability to manage the governmental accountability systems had not matched its responsibility to subject governmental financial activities to public scrutiny. Ibid. Consequently, the Legislature declared it had a fundamental duty to the taxpayers to oversee and promote the "professional conduct of internal audits, [the] assurance on the adequacy of internal financial controls within agencies of government, [and the] assess[ment] [of] the adequacy of controls over financial management, contracting, financial reporting and the delivery of government programs and activities with due regard to efficiency, effectiveness and economy." Ibid.

The Legislature determined there existed a compelling need to ensure "independence and integrity in the financial oversight of the discharge of its duties and responsibilities [to be] carried out in a manner and under a structure that safeguards the fiscal resources with which it has been entrusted[.]" Ibid. As a result, the Legislature established the OSC, which the State Comptroller administers, to satisfy these

responsibilities.  Ibid.  It also created the OSC to "subject governmental financial activities to uniform, meaningful, and systematic public scrutiny[.]"  Ibid.

To strengthen the integrity of the State Comptroller's statutory duties, the Legislature established an independent governmental framework.  Pursuant to N.J.S.A. 52:15C-2, and to comply with the provisions of article V, section IV, paragraph 1 of the New Jersey Constitution,[2] the Legislature declared that the OSC "shall be allocated in, but not of, the Department of the Treasury.  Notwithstanding this allocation, the [OSC] shall be independent of any supervision or control by the State Treasurer, or the department or by any division, board, office, or other officer thereof."  In this independent Executive Agency

---

[2]   This provision addresses the organization of various administrative offices and states:

> All executive and administrative offices, departments, and instrumentalities of the State government, including the offices of Secretary of State and Attorney General, and their respective functions, powers and duties, shall be allocated by law among and within not more than twenty principal departments, in such manner as to group the same according to major purposes so far as practicable. Temporary commissions for special purposes may, however, be established by law and such commissions need not be allocated within a principal department.
>
> [N.J. Const. art. V, § 4, ¶ 1.]

A-2573-15T2

capacity, the Legislature required the State Comptroller to "report directly to the Governor." N.J.S.A. 52:15C-2(b).

The State Comptroller's duties include a wide range of responsibilities under the Act. Under his direction, the OSC is responsible for conducting routine, periodic, and random audits of entities with executive branch authority including "public institutions of higher education, independent State authorities, units of local government and boards of education." N.J.S.A. 52:15C-5(a). Likewise, the OSC is responsible for "conducting assessments of the performance and management of programs of . . . public institutions of higher education, independent State authorities, units of local government and boards of education and the extent to which they are achieving their goals and objectives." Ibid.

The Legislature consolidated within the OSC coordination responsibility for internal and external audit functions. N.J.S.A. 52:15C-7. It therefore authorized the State Comptroller to establish an independent "full-time program of audit and performance review[.]" N.J.S.A. 52:15C-7(a). Such a program would be in addition to any audit or review conducted by entities other than the OSC. The Legislature also designed the consolidation of these functions to "provide increased

accountability, integrity, and oversight of . . . all . . . units of local government and boards of education[.]" Ibid.

To fulfill his statutory obligations under the Act, the Legislature directed the State Comptroller to establish various guidelines. The Legislature directed the State Comptroller to adopt rules and regulations in accordance with the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -15, "as shall be necessary to implement the provisions of this [A]ct." N.J.S.A. 52:15C-19; see also N.J.S.A. 52:15C-8(a) (stating in part that the State Comptroller "shall, pursuant to the provisions of the [APA], adopt rules and regulations necessary to effectuate the purposes of this [A]ct").

The State Comptroller enjoys broad powers under the Act. Pursuant to N.J.S.A. 52:15C-8(a), the State Comptroller "shall have all the powers necessary" to carry out his statutory duties, functions, and responsibilities. The State Comptroller has authority to conduct financial audits pursuant to N.J.S.A. 52:15C-8(c)(2), and performance audits pursuant to N.J.S.A. 52:15C-8(c)(3).

In accordance with N.J.S.A. 52:15C-8(c)(3), and pertinent to this appeal, the State Comptroller is required to establish objective criteria for analyzing whether to undertake a

performance audit. In deciding whether to conduct a performance audit, the State Comptroller must use that criteria and

> weigh relevant risk factors, including, but not limited to: (a) the size of the entity's budget, (b) the entity's past performance, (c) the frequency, scope, and quality of any audits or reviews that have been performed regarding the entity's financial condition or performance, (d) assessments or evaluations of the entity's management, performance or financial condition such as those undertaken as part of the New Jersey Quality Single Accountability Continuum for school districts, and (e) other credible information which suggests the necessity of a review.
>
> [N.J.S.A. 52:15C-8(c)(3).]

In this section, reference to "entity" means "any unit in the Executive branch of State government, including all entities exercising executive branch authority, public institutions of higher education, independent State authorities, units of local government and boards of education or their vendors." N.J.S.A. 52:15C-8(c)(4).

## II.

On March 31, 2015, a Director of the Audit Division in the OSC (the Audit Director) wrote the Superintendent and explained that the OSC had been analyzing whether to review the operations of certain school districts statewide. In his letter, the Audit Director explained the OSC had focused on those school districts

receiving fifty percent or more of their fiscal year 2013 budgets from State aid. The NBBOE fell into that category.

To determine whether to conduct the performance audit of the NBBOE, the Audit Director requested the NBBOE produce the following documentation for the period between July 2012 and March 2015:

> 1. Organizational Chart (including names of key personnel).
>
> 2. Written policies and procedures governing expenditures (including payroll).
>
> 3. Employment contracts for all bargaining units.
>
> 4. Board meeting minutes.
>
> 5. List, including vendor name, description of services and total amount paid, of all contracts exceeding $500,000.
>
> 6. Download of financial and payroll data.

The NBBOE produced a majority but not all of the requested information.

On May 21, 2015, the Audit Director notified the Superintendent that it intended to conduct the performance audit of "selected fiscal and operating practices of the [NBBOE]." A Deputy State Comptroller (the Deputy Comptroller) informed the NBBOE that the OSC would conduct the audit in accordance with applicable governmental auditing guidelines. The OSC then

scheduled a June 10, 2015 opening conference to address its agenda.

In anticipation of that conference, the OSC provided the Superintendent with a pamphlet, which contained a full description of the OSC's mission, authority, and audit process. The pamphlet listed such things as the dates the audit would cover; the OSC's intention to examine the NBBOE's fiscal and operating practices; and its plan to analyze the NBBOE's related accounting information system and controls. The pamphlet identified defendants' outstanding document responses, and the OSC's request for additional documents:

> Outstanding [document] Request:
>
> a. Financial Data — Download (Excel format preferred) of check register, purchase order journal and general ledger identifying specific transaction information including but not limited to vendor/payee name and number; purchase order/check date, number, amount; account number charged, etc. for Fiscal Years 2013-2015. Provide file layout explaining data headings[;]
>
> b. Year-end payroll report for Fiscal Years 2013-2015 (PDF or paper copy)[;]
>
> c. Policies 6422-6832 noted on table of contents or written confirmation that they are not used by the District[.]
>
> Additional [document] Request:
>
> d. Committee Report on the Administrative Reorganization of the North Bergen Public Schools[;]

e. Tuition Contract Agreements with Guttenberg Board of Education for Fiscal Years 2013-2015[;]

f. All Job Description Manuals for Fiscal Years 2013-2015[;]

g. Copy of Collective Bargaining Agreement covering Fiscal Year 2013 between North Bergen Council of Administrators and Supervisors and [the NBBOE;]

h. Copy of Collective Bargaining Agreement covering Fiscal Year 2013 between [the NBBOE] and North Bergen Education Association for Custodial and Maintenance Employees, Housekeeping, Audiovisual Technicians, Security Officers, Computer Technicians, Attendance Officers, and Bus Drivers[;]

i. All Executive Employment Agreements/Contracts for Fiscal Years 2013-2015 (not covered under a Collective Bargaining Agreement)[;]

j. Copy of contract with the Alamo Insurance Group for the administration of prescription services to Benecard Services, Inc[;]

k. Meeting Minutes for January 2013 (we only received page [one])[.]

In addition to providing its agenda, the OSC submitted to the Superintendent an Audit Engagement Information Technology Questionnaire.

In advance of the opening conference, the NBBOE's counsel communicated with the Deputy Comptroller as to why the State Comptroller had selected the NBBOE for the audit. He demanded

that she explain the State Comptroller's reasons for picking the NBBOE out of approximately seventy school districts, which purportedly fell within the OSC's target group. According to the NBBOE's counsel, the Deputy Comptroller explained to him that the OSC's goal was to sample a school district from an area in North Jersey and a school district from an area in South Jersey.

Defendants then made multiple requests for documents pursuant to Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13. The NBBOE's counsel certified that he sought "information on the selection process [for the performance audit] and the identity of other districts . . . contacted by the OSC." In its OPRA responses, the OSC withheld or redacted documents pursuant to OPRA's advisory, consultative, deliberative process, and investigation in progress exemptions.[3]

On June 9, 2015, the NBBOE's counsel wrote the OSC and stated "the [NBBOE] believes that it is entitled to know how it was selected for an audit and what, if any, weaknesses,

---

[3] Under a different docket number, the NBBOE challenged the adequacy of plaintiff's OPRA responses. On March 15, 2016, a Law Division judge entered an order rejecting the NBBOE's challenge, concluding plaintiff properly redacted and withheld certain documents under OPRA and the deliberative process privilege. The Law Division judge dismissed that matter with prejudice. Defendants did not appeal from that order of dismissal.

inadequacies or failures [existed] in the entities['] financial controls." He stated that the State Comptroller's power to conduct audits "appears to be limited" by N.J.S.A. 52:15C-8(c)(2), which unlike here, pertains to financial audits, not performance audits. He asserted that pursuant to N.J.S.A. 18A:23-1 and N.J.S.A. 18A:7A-10, the NBBOE "(1) ha[d] certified financial audits performed on an annual basis[,] and (2) [was] subject to review by the State of New Jersey Department of Education [(NJDOE)] under the New Jersey Quality Single Accountability Continuum [(NJQSAC)]."

On June 10, 2015, the NBBOE's counsel attended the scheduled opening conference, but he maintained that the NBBOE was entitled to know the State Comptroller's reasons for the audit before it commenced. Later that day, the NBBOE's counsel wrote to the OSC and stated that "[t]he [NBBOE] has essentially asked two simple questions of the OSC: (1) how was the [NBBOE] selected for this audit; and (2) has the OSC met the requirements necessary under its own enabling legislation to authorize the audit that it seeks to perform." The NBBOE counsel contended that the State Comptroller's authority to proceed with the audit is statutorily "triggered by findings of deficiency as to the [NBBOE] certified audit reports." After the NBBOE counsel refused to allow the performance audit to

proceed as planned, the State Comptroller directed the OSC audit team to leave the opening conference.

On June 11, 2015, the Deputy Comptroller issued a two-page informal letter to the NBBOE's counsel. She explained that the NBBOE was not entitled to the information requested by its counsel. She stated that the OSC had "absolute, unfettered authority" to conduct a performance audit of the NBBOE pursuant to the Act. She further explained that the Enabling Statute did not impose an obligation for the State Comptroller to disclose an "identification of weaknesses" to the NBBOE as a condition to conducting the performance audit. Defendants did not administratively appeal to the State Comptroller from the June 11 letter.

In her June 11 letter, the Deputy Comptroller asked counsel whether the NBBOE intended to submit to the performance audit without conditions "as required by law." The NBBOE reiterated its position that it was entitled to the information requested, especially because the NBBOE had recently undergone audits by the NJQSAC, and had received a purportedly favorable Comprehensive Annual Financial Report (CAFR) from an independent consultant. The NBBOE counsel certified that the NBBOE would "not proceed[] with the opening conference unless and until the

OSC ha[d] complied with [his interpretation of] the [Enabling Statute]."

### III.

In July 2015, plaintiff filed an order to show cause (OTSC) and this verified complaint. In the verified complaint, plaintiff sought a declaratory judgment that it had "unfettered authority to conduct a performance audit [of the NBBOE] pursuant to N.J.S.A. 52:15-1, -5, -7, and -8(c)(3), without having to demonstrate . . . that it has satisfied any preconditions before commencing such performance audit[.]" Plaintiff sought an order compelling defendants' full cooperation with the performance audit.

In its proposed OTSC, plaintiff identified Rule 4:67-1(b) (allowing summary applications under certain circumstances where the matter may be completely disposed of in a summary manner). The proposed OTSC sought various declarations interpreting N.J.S.A. 52:15-1, -5, -7, and -8(c)(3). Plaintiff withdrew the OTSC,[4] defendants filed their answer to the verified complaint, and the matter proceeded to pre-trial discovery.

In pre-trial discovery, defendants demanded production of all documents relating to the audit; propounded interrogatories

---

[4]    The parties agree that plaintiff withdrew the OTSC for lack of proper service.

seeking a detailed description of "the protocol, procedure, and/or process utilized by [plaintiff] in selecting the NBBOE for the audit"; and served deposition notices for the State Comptroller, Deputy Comptroller, and Supervising Audit Manager of the OSC.

Plaintiff explained that it had produced the demanded documents in response to defendants' numerous OPRA requests, and that the deliberative process privilege protected the remaining items sought. At this point, plaintiff categorized this lawsuit as an "enforcement action seeking an order compelling [d]efendants' [full] cooperation with [plaintiff's] performance audit as mandated by [the Enabling Statute]." Thereafter, plaintiff filed its motion for summary judgment, and defendants cross-moved to compel production of discovery.

At oral argument before the judge, a Deputy Attorney General (DAG) stated that plaintiff sought summary judgment pursuant to Rule 4:67-6 (governing the process for enforcing agency orders). The DAG stated to the judge that "the State is . . . moving under [Rule 4:67-6(c)(2)] to enforce the State's [']order['] . . . to undergo and cooperate with an audit." The DAG attempted to enforce the June 11, 2015 letter, and requested an order compelling defendants to cooperate unconditionally with the audit.

The judge granted plaintiff's motion for summary judgment without relying on Rule 4:67-6, denied the NBBOE's cross-motion for production of discovery, and rendered a written decision. As to the cross-motion, the judge determined that the deliberative process privilege precluded production of the requested discovery. Then the judge concluded the NBBOE's conditional cooperation contravened the Act's statutory scheme. He found that the State Comptroller established and weighed objective criteria, which justified the performance audit pursuant to N.J.S.A. 52:15C-8(c)(3). Relying on his interpretation of the Act, the judge rejected the NBBOE's attempt to impose preconditions to its statutory obligation to cooperate with the State Comptroller's audit.

The NBBOE moved for reconsideration contending primarily that the State Comptroller had failed to comply with the Act by providing his reasons for selecting the NBBOE for the audit. Plaintiff repeated its position that no such statutory requirement existed, and cross-moved to enforce litigant's rights pursuant to Rule 1:10-3. As to the reconsideration motion, the judge stated that the

> Enabling Statute "simply establishes objective criteria and other factors which [the State Comptroller] must consider during its selection process." I further held that the [Enabling] Statute does not require [the State Comptroller] "to make any disclosure

> or provide some rationale to the auditee
> before conducting its audit, or to provide
> some rationale that i[t] has complied with
> its statutory obligations." . . .
> Defendants argue once again, without
> offering any support for their argument,
> that [the State Comptroller] must satisfy
> preconditions before [d]efendants are
> required to comply with the audit. Again, I
> reject this argument.

The judge denied reconsideration, and enforced the court's December 22, 2015 order.

## IV.

On appeal, the NBBOE argues generally that plaintiff failed to comply with the Enabling Statute; genuine issues of material fact preclude summary judgment; the deliberative process doctrine is inapplicable; and the court failed to conduct an in camera review of records.

## A.

Before reaching the merits of defendants' contentions, we briefly address the procedural posture of the appeal. At no point did the NBBOE administratively appeal to the State Comptroller from the informal determination contained in the June 11 letter of the Deputy Comptroller. Thus, the State Comptroller never rendered a final agency determination from which the NBBOE could appeal to us. Instead, as evidenced in the OSC's verified complaint and OTSC, plaintiff sought a

summary declaration to enforce its rights under the Act pursuant to Rule 4:67-1(b).

At oral argument before the judge, plaintiff erroneously relied in part on Rule 4:67-6, which vests in the trial court jurisdiction for agency enforcement proceedings and simultaneously preserves our exclusive jurisdiction to review the merits of agency determinations pursuant to Rule 2:2-3(a)(2). Rule 4:67-6 generally applies to actions brought by an agency to enforce "an order already entered by it." Pressler & Verniero, Current N.J. Court Rules, comment 2 on R. 4:67-6(a)(1) (2017). Here, there is no such order from the State Comptroller to enforce.

Under certain circumstances, which do not exist here, a trial court may simultaneously address whether to enforce an agency order and consider an objection that the order is invalid. For example, Rule 4:67-6(c)(2) states in part that "[i]f enforcement of an order is sought pursuant to [Rule] 1:9-6 and no proceeding is pending in the Appellate Division to review or seeking to review its validity, [then] such review shall be had in the trial court by way of defense to enforcement." Rule 4:67-6(c)(2), however, pertains to enforcement of an order sought pursuant to Rule 1:9-6. Plaintiff did not seek

enforcement of an order pursuant to <u>Rule</u> 1:9-6.  As a result, plaintiff's reliance on <u>Rule</u> 4:67-6(c)(2) is misplaced.

Nevertheless, plaintiff correctly filed its verified complaint and OTSC seeking to enforce defendant's statutory obligation to cooperate with the State Comptroller's audit under the Act pursuant to <u>Rule</u> 4:67-1(b).  The judge properly adjudicated the controversy and entered declaratory relief.  As a result, we consider the matter on the merits.

B.

When reviewing an order granting summary judgment, we apply "the same standard governing the trial court."  <u>Oyola v. Liu</u>, 431 <u>N.J. Super.</u> 493, 497 (App. Div.), <u>certif. denied</u>, 216 <u>N.J.</u> 86 (2013).  We owe no deference to the motion judge's conclusions on issues of law.  <u>Manalapan Realty, L.P. v. Twp. Comm. of Manalapan</u>, 140 <u>N.J.</u> 366, 378 (1995).  Applying these standards, we conclude there was no error.

It is undisputed that defendants refused to proceed until the State Comptroller explained why he selected the NBBOE for the audit.  On June 11, 2015, the NBBOE's counsel stated in writing that the NBBOE "did not proceed on June 10, 2015 because [in his view] the OSC has refused to comply with the requirements of <u>N.J.S.A.</u> 52:15C-8(c)."  On June 17, 2015, the NBBOE's counsel wrote the Deputy Comptroller repeating his

20

position that there existed "conditions precedent to the exercise of the performance audit[.]"  He attached a legal analysis to his letter, which further concluded that "fundamental fairness and the mutual respect owed by governmental entities" required the State Comptroller to give his rationale for the audit request.  As a result, we turn our attention to the issue of whether the State Comptroller is required to disclose his reasons for seeking a performance audit.  We review that legal issue de novo.

Well-settled legal principles govern our interpretation of the Act.  "The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492 (2005).  In interpreting a statute, we give words "'their ordinary meaning and significance,' recognizing that generally the statutory language is 'the best indicator of [the Legislature's] intent.'"  Tumpson v. Farina, 218 N.J. 450, 467 (2014) (alteration in original) (quoting DiProspero, supra, 183 N.J. at 492).  We read each statutory provision "in relation to other constituent parts so that a sensible meaning may be given to the whole of the legislative scheme." Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012).  "[I]f there is ambiguity in the statutory language that leads to more than

one plausible interpretation, we may turn to extrinsic evidence, 'including legislative history, committee reports, and contemporaneous construction.'" DiProspero, supra, 183 N.J. at 492-93 (quoting Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 75 (2004)).

The plain text of the Act demonstrates that unconditional cooperation by an auditee is essential to the State Comptroller fulfilling his statutory duties and responsibilities. Unconditional cooperation is also fundamental to achieving the goal of "subject[ing] governmental financial activities to uniform, meaningful, and systematic public scrutiny[.]" N.J.S.A. 52:15C-1. The Legislature unambiguously declared in N.J.S.A. 52:15C-14(a) that

> [a]ll units in the Executive branch of State government, including entities exercising Executive branch authority, independent State authorities, public institutions of higher education, units of local government and boards of education and their employees shall provide full assistance and cooperation with any audit, performance review or contract review by the State Comptroller.
>
> [(Emphasis added).]

An auditee is therefore unambiguously required to fully cooperate and assist the State Comptroller with any audit. Such cooperation and assistance is mandatory.

An auditee may not condition its cooperation and assistance on the State Comptroller first explaining why he selected the auditee for the performance audit. Such a contingency would compromise the State Comptroller's role of providing independent financial oversight. And it would potentially delay the audit, like here, by requiring the State Comptroller to justify his reasons for the performance audit before it commenced; respond to numerous OPRA requests; litigate a separate OPRA lawsuit against the OSC; review extensive document demands and multiple interrogatories; and object to deposition notices of several OSC individuals, including the State Comptroller himself. Nothing in the Act indicates that the Legislature envisioned such a protracted process when it created the position of State Comptroller and the OSC.

Rather, the State Comptroller employed the procedure outlined in the Act for deciding whether to conduct the performance audit. Pursuant to N.J.S.A. 52:15C-8(c)(3), he established and weighed various factors before selecting the NBBOE for the performance audit. Among other things, the State Comptroller analyzed organizational charts, written policies and procedures governing expenditures, specific employment contracts for bargaining units, board meeting minutes, vendor names and services for contracts exceeding $500,000, payroll data,

23                                                          A-2573-15T2

committee reports, job description manuals, and other executive employment agreements. The judge was satisfied, and so are we, that the State Comptroller adhered to the procedure listed in N.J.S.A. 52:15C-8(c)(3).

The Legislature could have required the State Comptroller disclose to a prospective auditee the risk factors that it considered when evaluating whether to conduct a performance review. It could have tied an auditee's cooperation and assistance to disclosure by the State Comptroller of his reasons for selecting that auditee before commencing the audit. But the Legislature did not impose any such requirements. And for good reason: requiring conditional cooperation would telecast the State Comptroller's concerns to the auditee; hinder the State Comptroller's fundamental role of providing independent oversight and ensuring public financial control and accountability statewide; and would have a substantial adverse impact upon the goal of transparently managing the State's increased governmental systems.

Imposing such a requirement would also require us to re-write the Enabling Statute, a function that is not ours to perform. DiProspero, supra, 183 N.J. at 492. Requiring the State Comptroller to provide his reasons for conducting a performance audit before commencing the audit would therefore

fly in the face of the Act's central purpose and statutory scheme.

### C.

We reject defendants' contention that the judge erred by denying their cross-motion for production of discovery. Defendants assert that the judge misapplied the deliberative process privilege. Defendants argue that the judge should have conducted an in camera review of documents.

Defendants demanded documents revealing plaintiff's "protocol, procedure, and/or process" employed by the State Comptroller to select the NBBOE for the audit. As we have previously stated, the Legislature established a statutory scheme intending to promote fiscal responsibility and accountability at all levels of government. Requiring the OSC to reveal its internal reasons for selecting an auditee would significantly undermine the State Comptroller's independent oversight role in safeguarding efficient and independent public financial control and accountability statewide. For these reasons alone, defendants are not entitled to this type of discovery.

As to the judge's application of the deliberative process privilege, we note the following longstanding principles. The doctrine existed before OPRA was enacted in 2001, see In re

Liquidation of Integrity Ins. Co., 165 N.J. 75, 83-85 (2000), and was since codified as an OPRA exemption in N.J.S.A. 47:1A-1.1. "Although OPRA rather broadly defines what is a 'government record,' it expressly provides that the term 'shall not include inter-agency or intra-agency advisory, consultative or deliberative material.'" Ciesla v. N.J. Dep't of Health & Sr. Servs., 429 N.J. Super. 127, 137 (App. Div. 2012) (quoting N.J.S.A. 47:1A-1.1). "This exemption has been construed to encompass the deliberative process privilege, which has its roots in the common law." Ibid. (citing Educ. Law Ctr. v. N.J. Dep't of Educ., 198 N.J. 274, 284 (2009)).

Under the doctrine, the government may withhold documents that include "advisory opinions, recommendations, and deliberations comprising part of a process by which [its] decisions and policies are formulated." Id. at 137 (alteration in original) (quoting Integrity, supra, 165 N.J. at 83). For the privilege to apply, the document needs to meet two requirements. Id. at 138. First, an agency must prove that a document is "'pre-decisional,' i.e., 'generated before the adoption of an agency's policy or decision.'" Ibid. (quoting Integrity, supra, 165 N.J. at 84). Second, the document must be deliberative, meaning it "contain[s] opinions, recommendations, or advice about agency policies." Ibid. (alteration in

original) (quoting Integrity, supra, 165 N.J. at 84-85). Deliberative material may include material involved in the exercise of "policy-oriented judgment," Educ. Law Ctr., supra, 198 N.J. at 295, or "policy-infused decision[s,]" Ciesla, supra, 429 N.J. Super. at 142. "A court must assess such fact-based documents against the backdrop of an agency's deliberative efforts in order to determine a document's nexus to that process, and its capacity to expose the agency's deliberative thought-processes." Educ. Law Ctr., supra, 198 N.J. at 299-300. The documents in question undoubtedly expose the OSC's pre-decisional opinions, recommendations, or advice about its policies and thought-processes.

Here, plaintiff withheld an internal OSC audit proposal, planning memorandum, and risk/priority evaluation. The audit proposal memorialized the OSC's preliminary analysis, applied certain objective criteria established by the State Comptroller, and contained the OSC's recommendations. The planning memorandum revealed the OSC's strategic pre-decisional risk analysis, and provided the State Comptroller with the OSC's risk/priority evaluation.

These documents implicitly reflected the OSC's internal deliberative pre-decisional process and policy recommendations to the State Comptroller as to whether to audit certain school

27

districts. The documents demonstrated, from a pre-decisional policy perspective, not only what school districts to audit, but also what conduct to audit. And the documents showed the OSC's pre-decisional policy determinations as to how to perform the audits. In addition, the documents included consideration of additional objective criteria, beyond those mentioned in N.J.S.A. 52:15C-8(c)(3).

Such internal policy communication within the OSC is vital to the State Comptroller's ability to safeguard efficient and independent public financial control and accountability statewide. And such OSC communication enables the State Comptroller to perform his independent statutory oversight functions designed to fundamentally strengthen governmental fiscal responsibility and accountability. Furthermore, production of such information would arm auditees with the ability to hinder performance audits.

We conclude that defendants' remaining argument, that the judge abused his discretion by failing to perform an in camera inspection of the documents, is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We add the following brief comments.

The record, which contains numerous certifications, shows the judge could readily determine that the documents were not

subject to disclosure. Like in cases involving OPRA, courts must balance the need for confidentiality against the public interest for information before determining whether to conduct an in camera review of documents. See Loigman v. Kimmelman, 102 N.J. 98, 112-13 (1986). Documents exempt from access are not subject to in camera review. Paff v. N.J. Dep't of Labor, Bd. of Review, 379 N.J. Super. 346, 355 (App. Div. 2005). Here, the trial court found correctly that "public interest favored [the OSC]," and there was no need for an in camera review. As such, they are exempt from disclosure.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2573-15T2